#23613-a-JKK

**2007 SD 4**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,           Plaintiff and Appellee,

  v.

TAM THI THU NGUYEN,              Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE PETER LIEBERMAN
Judge

* * * *

LAWRENCE E. LONG
Attorney General

CRAIG M. EICHSTADT
Deputy Attorney General  Attorneys for plaintiff
Pierre, South Dakota  and appellee.

MICHAEL J. BUTLER of
Butler Law Office, P.C.  Attorney for defendant
Sioux Falls, South Dakota  and appellant.

* * * *

ARGUED ON APRIL 25, 2006

OPINION FILED **01/03/07**

#23613

KONENKAMP, Justice

[¶1.]     Defendant was arrested, charged, and convicted of possession of more than ten pounds of marijuana and possession with the intent to distribute or dispense more than one pound of marijuana.  She was apprehended when a drug detection dog sniffed the substance in the trunk of her rental car.  She moved to suppress the evidence on the grounds that the dog was not a reliable drug detector and did not properly "indicate" the presence of marijuana.  We conclude (1) that the dog was reliable based on its certification and training, and (2) the response it displayed to its law enforcement officer handler was a sufficient indication of the presence of an illicit substance.  Accordingly, we affirm.

## Background

[¶2.]     On March 10, 2004, Tam Thi Thu Nguyen was driving east near Sioux Falls on I-90, just past the interchange between I-29 and I-90, when she was stopped by South Dakota Highway Patrol Trooper Christopher Koltz.  Trooper Koltz stopped Nguyen at 9:30 p.m. after he observed her following another vehicle too closely.  According to the trooper, the brown Chevy Impala driven by Nguyen was following a blue van with less than one car's length distance between the vehicles.  The infraction continued when he observed both vehicles simultaneously make a left lane change, and a subsequent right lane change, again, simultaneously.  It was at this time Trooper Koltz positioned his vehicle behind Nguyen's and activated his emergency lights.  Nguyen pulled her vehicle over and stopped on the shoulder.  The events of the stop were recorded by a video camera mounted in Trooper Koltz's patrol car.

-1-

[¶3.]    After pulling Nguyen's vehicle over, Trooper Koltz exited his patrol car and approached the passenger side of the Impala. He introduced himself and then informed Nguyen of the reason for the stop. Through the window of the vehicle the trooper noticed an open atlas and food wrappers on the passenger seat, and, in the backseat, he saw a piece of luggage. When Trooper Koltz asked for Nguyen's driver's license and vehicle registration, he observed her act nervously: her hand was shaking when she handed him her license. He then told her that he was only going to issue her a warning ticket, but that he would like her to go and sit in the passenger seat of his patrol car.

[¶4.]    Once out of her vehicle, Nguyen expressed reluctance in response to the trooper's request that she get into the patrol car. She said she was scared and asked to see his badge. He inquired if she would like another officer to be called to the scene. She replied that it was not necessary, and then proceeded to get into the patrol car. However, before she entered his vehicle, the trooper warned her that a drug detection dog was located in the backseat. Inside the patrol car, Trooper Koltz questioned her about the purpose of her trip. She told him that she was from Renton, Washington, and was heading to Chicago to see some friends. He asked about her employment, to which she responded that she "buys things for people." Upon further inquiry, she told Trooper Koltz that she shops for people for a lump sum charge or an hourly rate.

[¶5.]    During their discussion in the patrol car, Kaz, the drug detection dog, was barking intermittently. There was a mesh cage separating Kaz from the front seat, but air could pass freely through the cage. Trooper Koltz later testified that

Kaz went over and sniffed right behind where Nguyen was seated, and "then he began to give his indication to the odor of illegal drugs. He did that by biting at the [rubber] kennel mat" in the backseat. Indeed, on the videotape, Trooper Koltz can be heard explaining to Nguyen that his dog's barking and biting at his kennel while she was in the patrol car was "one of the things [the dog] does when he's trying to tell me he can smell one of the odors he's trained to detect." An audible squeaking created by this biting can be heard on the video tape.

[¶6.]     Trooper Koltz asked Nguyen whether she had any illegal drugs on her person or in the vehicle. Nguyen replied no. The trooper next asked "whether the odor of illegal drugs would be present on the vehicle or in the vehicle." Nguyen again said no. He then informed her that while the background check was proceeding, he was going to take Kaz and conduct a walk-around sniff of her vehicle. Trooper Koltz exited the patrol car and retrieved Kaz. After they proceeded near the front of the patrol vehicle, the trooper and Kaz can be seen on the video. Kaz is on a leash and being led towards the driver's side of Nguyen's vehicle. The trooper stops near the driver's side door, turns around and leads Kaz from the driver's side area towards the back of the vehicle. The trooper is at all times in front of Kaz, while the two continue to move forward toward the passenger's side, to the front of the vehicle, and then back toward the driver's side door.

[¶7.]     During this first trip around the vehicle, Kaz can be seen actively sniffing the exterior of the car, tail wagging, nose touching the vehicle, with his body parallel to the vehicle. Kaz continues to sniff in this position until he reaches the trunk area. Here, Kaz pauses momentarily, but resumes his circling of the

vehicle, with his body parallel and nose touching. When Kaz arrives near the passenger door, he again pauses briefly. His body position changes slightly, but as with the trunk, Kaz moves on, now toward the front of the vehicle, and back to the driver's side door.

[¶8.]     Trooper Koltz then takes Kaz around the vehicle a second time. Beginning again on the driver's side, Kaz actively sniffs the exterior of the vehicle, moving his head up and down, wagging his tail, but still in a constant movement forward with his body parallel to the vehicle. When he approaches the trunk area, Kaz stops. This time his body becomes perpendicular to the vehicle. Kaz continues to actively sniff the trunk area, moving his nose up and down, with his tail wagging. Trooper Koltz leaves slack in Kaz's leash, and can be seen looking at Kaz. The trooper mouths some words.[1] Kaz then appears to be biting at the fender part of the vehicle under the trunk. After this, Trooper Koltz moves toward Kaz, pets him, and continues to mouth some words. Kaz returns momentarily to continue biting the fender. The trooper pulls Kaz away by the leash and returns him to the patrol car.

[¶9.]     After Trooper Koltz's observation of Kaz's behavior, he informed Nguyen that Kaz indicated the odor of an illegal substance. Because of Kaz's indication, Trooper Koltz told her that he was going to search her vehicle. She asked if she could say no, and he responded that he did not need her permission because Kaz's indication gave him probable cause to conduct the search. By that

---

1.     The video camera in the patrol vehicle did not pick up any audio of what occurred outside the vehicle during the dog sniff.

time, another trooper had arrived at the scene. He assisted Trooper Koltz in searching the trunk of Nguyen's vehicle. Two duffel bags, one containing twenty individually wrapped packages of marijuana and a second containing thirty of the same, were found in Nguyen's trunk. The combined weight of the marijuana came to 53.94 pounds. Nguyen was placed under arrest and charged with possession of more than ten pounds of marijuana, and possession with the intent to distribute or dispense more than one pound of marijuana.

[¶10.] On April 15, 2004, Nguyen moved the court to suppress the evidence seized from her vehicle. She alleged that (1) her vehicle was stopped without reasonable suspicion, (2) once stopped, Trooper Koltz, without legal justification, impermissibly extended the scope of an otherwise routine traffic stop, and (3) Trooper Koltz did not have probable cause to search the trunk of her vehicle. Evidentiary hearings were held on July 26, September 21, and November 16, 2004. The trial court denied Nguyen's motion to suppress on all issues. The court found that "Trooper Koltz had probable cause to search Tam Thi Thu Nguyen's vehicle based upon the objectively observable indication of this properly trained and certified drug detection dog, 'Kaz.'"

[¶11.] After a trial to the court on February 8, 2005, Nguyen was convicted of both charges, and on March 18, 2005, she was sentenced to the penitentiary. On appeal, Nguyen does not contest that Trooper Koltz had reasonable suspicion to justify the stop. Instead, she raises two issues: (1) whether the evidence established that the drug detection dog was reliable, and (2) whether the trooper

had probable cause to search Nguyen's vehicle based on the behavior of his drug detection dog.

## Standard of Review

[¶12.]       A trial court's decision on whether probable cause exists is reviewed de novo, as it presents a mixed question of law and fact.  State v. Lockstedt, 2005 SD 47, ¶14, 695 NW2d 718, 722 (citing Ornelas v. United States, 517 US 690, 696-99, 116 SCt 1657, 1661-63, 134 LEd2d 911 (1996); State v. Stanga, 2000 SD 129, ¶8, 617 NW2d 486, 488).  However, the court's findings of fact are reviewed under the clearly erroneous standard.  Id. (citing State v. Guthrie, 2001 SD 61, ¶56, 627 NW2d 401, 423).  When we review a court's decision to deny a defendant's motion to suppress evidence, "we view the evidence in a light most favorable to the court's findings of fact."  Id. (citing State v. Tilton, 1997 SD 28, ¶21, 561 NW2d 660, 665).  The trial judge remains the sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony.

## Analysis and Decision

### 1.  Reliability of Drug Detection Dog

[¶13.]       Nguyen argues that Kaz is not a reliable drug detection dog and that his reliability must be established before probable cause can be found.  She entered into evidence certain South Dakota Highway Patrol records maintained by Trooper Koltz over a sixteen-month period, December 2002 to April 2004.  According to Nguyen, these records document that Trooper Koltz conducted 183 "hand searches" based on his observation that Kaz indicated to the odor of a controlled substance.  Of those 183 searches, controlled substances were uncovered in 84 instances.  Thus,

Nguyen contends, 99 "indications" by Kaz resulted in no controlled substances being found. Based on this data, Nguyen maintains that Kaz's failure rate is 54%, and, that as a matter of law, Kaz cannot be considered reliable with such a failure rate.[2]

[¶14.] Trooper Koltz, however, explained that defense counsel's calculations do not accurately reflect Kaz's reliability. He testified that when Kaz indicates, he is responding to the *odor* of a controlled substance, not its conclusive presence. Therefore, in situations where Kaz indicated, but a controlled substance was not uncovered, that indication, according to Trooper Koltz, would not necessarily be considered a failure. Instead, he said that in many instances Kaz's indication was later explained by the fact that the person in the car searched was an admitted user or that the person was in the presence of someone who had used drugs. Thus, the State maintains that Kaz is reliable and his training and certification support the trial court's conclusions.

[¶15.] This Court has not had the occasion to examine how a drug detection dog's reliability must be shown before probable cause can exist to justify a search.

---

2. Defense witness Dr. Dan Craig testified to these figures. The State did not challenge them. In reading Trooper Koltz's "Activity Reports" upon which these figures were based, we see that they document searches of numerous school lockers, cars and trucks in parking lots, semi tractors, and buildings, as well as single vehicles. No written explanatory compilation or statistical summary was offered in connection with Dr. Craig's testimony. From our own review of these documents, examining only those instances where the dog performed an exterior sniff of a single automobile, as in the case here, we counted 54 reports stating "Indication. No drugs found." Another 60 reports state, "Indication. Drugs found." And 75 reports state, "No indication." Presumably these latter reports resulted in no searches. There were 8 reports where the dog indicated the presence of drugs on the subject while seated in the patrol car. There was one instance where the dog indicated to a large amount of cash, but no drugs.

In *State v. Chavez* we cited an Eighth Circuit Court of Appeals case for the proposition that "[a] dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance *if the dog is reliable*." 2003 SD 93, ¶30, 668 NW2d 89, 98 (emphasis added) (citing United States v. Sundby, 186 F3d 873, 875-76 (8thCir 1999)). We must therefore determine what is required to prove a drug detection dog's reliability.

[¶16.] From the jurisdictions that have considered this question, three divergent views have emerged. First, there are a host of courts that deem a dog reliable solely because the evidence shows that the dog was trained and certified to detect controlled substances. *Sundby,* 186 F3d at 876; United States v. Kennedy, 131 F3d 1371, 1376-77 (10thCir 1997), *cert. denied,* 525 US 863, 119 SCt 151, 142 LEd2d 123 (1998); United States v. Berry, 90 F3d 148, 153 (6thCir 1996); United States v. Meyer, 536 F2d 963, 966 (1stCir 1976); United States v. Patty, 96 FSupp2d 703, 707 (EDMich 2000); State v. Gross, 789 P2d 317, 319 (WashCtApp 1990), *overruled on other grounds*, State v. Thein , 977 P2d 582 (Wash 1999). Second, some jurisdictions consider a dog's training and certification to be *prima facie* evidence that the dog is reliable. The burden then shifts to the defense to produce evidence to challenge the dog's reliability. United States v. Wood, 915 FSupp 1126, 1134-35 (DKan 1996), *rev'd on other grounds*, 106 F3d 942 (10thCir 1997); State v. Laveroni, 910 So2d 333, 335 (FlaCtApp 2005); Dawson v. State, 518 SE2d 477, 479-80 (GaCtApp 1999). Third, a minority of jurisdictions either require or allow a dog's field activity reports, along with evidence that the dog is trained and certified, to be considered as factors in determining reliability. United States v.

Limares, 269 F3d 794, 797-98 (7thCir 2001); United States v. Diaz, 25 F3d 392, 395-96 (6thCir 1994); United States v. Lingenfelter, 997 F2d 632, 639 (9thCir 1993); United States v. Outlaw, 134 FSupp2d 807, 810-12 (WDTex 2001); State v. Barker, 850 P2d 885, 891-93 (Kan 1993); State v. England, 19 SW3d 762, 768-69 (Tenn 2000). Nonetheless, the prevailing view with respect to reliability is that the decision ultimately rests in the trial court's sound discretion. *Diaz*, 25 F3d at 394; *Outlaw,* 134 FSupp2d at 814; *Laveroni*, 910 So2d at 336; Matheson v. State, 870 So2d 8, 12 (FlaCtApp 2003); *Dawson*, 518 SE2d at 480; State v. Braendle, 997 P2d 634, 637 (IdahoCtApp 2000); *England*, 997 P2d at 636.

[¶17.] In this case, the trial court found that Kaz was "a reliable dog trained to detect the odor of illegal drugs." Sergeant David Huntimer of the Sioux Falls Police Department, who was responsible for training and recertifying Trooper Koltz and Kaz, testified about their training regimen. He explained the manner in which the trooper and Kaz are scored and what techniques are used to ensure reliability. He testified that Kaz and Trooper Koltz are currently trained and certified and they continue to participate in further training and recertification. According to Trooper Koltz, he and his dog undergo training approximately every two weeks.

[¶18.] Nguyen does not dispute that Kaz is trained and certified, but insists that Kaz's field activity reports reflect his unreliability. Nguyen's expert, Dr. Dan Craig, a former canine handler and trainer who has worked primarily with government and military agencies, testified that Kaz cannot be considered reliable with a failure rate above 50%. Sergeant Huntimer and Trooper Koltz, however, explained that these field reports cannot demonstrate Kaz's reliability because

there are too many unknowns. While the court did accept the field activity reports admitted by Nguyen, it gave little weight to them because "dogs are trained to detect the odor of drugs and not the drugs themselves."

[¶19.] In the approximate 223 activity reports in the defense exhibit, most state at the bottom either "No Indication," "Indication. Drugs found," or "Indication. No drugs found." However, in many instances where the report states "Indication. No drugs found," there are additional notes that attempt to explain why the dog may have indicated the odor of drugs where none were found. For example, some of these reports state: "No drugs found. Known crack dealers. Admitted dropping off drugs earlier in the AM." "No drugs found. Admitted marijuana user." "No drugs found. Admitted user." "No drugs found. Admitted user of meth and marijuana." "No drugs found. Claimed he just left house where marijuana was being used." "No drugs found. Admitted smoking marijuana earlier in the AM." "No drugs found. Admitted use of marijuana the night before."

[¶20.] As both Trooper Koltz and Sergeant Huntimer explained, the scent of drugs may remain in a car after the drugs are removed. "[D]ogs have the ability to detect the smallest traces of odors and to perceive these scents much better than human beings." Robert C. Bird, *An Examination of the Training and Reliability of the Narcotics Detection Dog,* 85 KyLJ 405, 409 (1997). Although these apparently false indications give us pause, as they did the trial court, we do not believe these field reports should be relied on, standing alone, in measuring Kaz's reliability. *See, e.g., Braendle*, 997 P2d at 637 (upholding warrantless vehicle search because "the police possessed probable cause to believe there was contraband in the vehicle[,]"

despite the fact that the drug dog had previously given false positive reactions in response to residual odor of drugs); *Dawson*, 518 SE2d at 481 (finding that "there was significant evidence of [drug detection dog's] reliability and training" in detecting drugs, and noting that "there is no way to verify whether the dog actually detected a residual odor of contraband or whether it made a false alert"). In our view, trial courts making drug dog reliability determinations may consider a variety of elements, including such matters as the dog's training and certification, its successes and failures in the field, and the experience and training of the officer handling the dog. Under the totality of circumstances, the court can then weigh each of these factors. *See* State v. Cabral, 859 A2d 285, 298-99 (MdCtApp 2004).

[¶21.] Based on the evidence in the record, we conclude that the trial court's findings were not clearly erroneous.[3] We agree with the trial court that the dog and law enforcement handler's certification and training history are important in determining reliability. The court found that Kaz was "certified and recertified in detecting marijuana." Documents admitted into evidence detailing the training regimen for Kaz and Trooper Koltz show consistently passing scores in training and drug detection.[4] With the training being conducted in controlled circumstances, a

---

3. Some courts have specifically held that a drug detection dog's false-positive alerts will not automatically negate reliability. *Diaz*, 25 F3d at 396; *Dawson*, 518 SE2d at 481.

4. The trial court noted that "the testimony that sometimes drugs are not found when Kaz alerts is somewhat troubling," but found it "not convincing" because "drug dogs alert to the smell of drugs and not to their presence." Other courts have also rejected Dr. Dan Craig's dictum that "[t]he odor is there if the drug is there. The drug is there if the odor is there." *See* $217,590.00 in United States Currency v. Texas, 54 SW3d 918, 922

(continued . . .)

dog's ability to find and signal the presence of drugs can be accurately measured. In the field, one simply cannot know whether the dog picked up the odor of an old drug scent or whether it mistakenly indicated where there was no drug scent.

## 2. Probable Cause to Search – Drug Dog "Indication"

[¶22.]    We must next determine whether Kaz's behavior during the exterior sniff of Nguyen's vehicle amounted to an "indication" so as to give Trooper Koltz probable cause to search. *See Lockstedt*, 2005 SD 47, ¶9 n1, 695 NW2d at 721 n1. An indication is "a dog's trained behavior to signal its handler that a target odor is in the location being sniffed." *Id.* An alert, conversely, is "the dog's innate or involuntary response when sniffing a particular odor." *Id.* In this case, it is undisputed that Kaz was trained as an aggressive indicator. However, there was conflicting evidence on whether the behavior Kaz exhibited in the video was the aggressive response indication it was trained to perform.

[¶23.]    At the suppression hearing, the expert for the defense, Dr. Craig, testified that a drug detection dog is trained with only *one* specific response behavior. He termed this the "defined final response." Because Kaz was trained as an aggressive indicator, Dr. Craig declared that scratching would be Kaz's defined final response. Thus, when Kaz bites or barks, those behaviors are untrained responses and do not constitute an indication.

---

(. . . continued)

> (TexCtApp 2001). In that case, the court noted that the drug dog "Nemo" alerted on "numerous occasions" when no drugs were found. There, it was explained that "because narcotics can leave a residue which is detectable by a dog's sense of smell, the alerts were not necessarily erroneous." *Id.* at 922; *contra Matheson*, 870 So2d at 12.

[¶24.] Nguyen also offered testimony from former South Dakota Highway Patrolman and canine handler, John "Nick" Vlasman. Vlasman worked as a highway patrolman for South Dakota from 1985 to 2003, and as a drug dog handler from 1996 to 2003. He testified that his dog, like Kaz, was trained as an aggressive indicator. Because Vlasman had multiple opportunities to observe Kaz in training, he stated that Kaz was specifically trained as a scratch responder. The training regime, according to Vlasman, included particular techniques and simulations for reinforcing scratching behavior. He further stated that no specific training techniques existed for reinforcing barking behavior. Instead, Vlasman testified that barking and biting would be considered incidental to the scratching behavior.

[¶25.] As additional evidence that Kaz was specifically trained to indicate by scratching, Nguyen offered a video from a South Dakota Public Broadcasting (PBS) program. This video profiled Trooper Koltz and Kaz. In the video, Kaz can be seen scratching and biting vigorously at a light switch where the odor of an illegal substance was present. According to Nguyen, this aggressive scratching clearly shows that Kaz detected the odor of a controlled substance. Moreover, the aggressive scratching is objectively observable behavior that informs Trooper Koltz, and a court, that Kaz has indicated the odor of drugs. Any other behavior, such as biting and barking, would not be an objectively observable indication, asserts Nguyen.

[¶26.] Trooper Koltz, on the other hand, testified that Kaz was not solely trained to scratch, but was trained to respond in one of three ways: biting, barking, or scratching. Specifically, he stated that Kaz "can do all three of these or he can do

one of these, but this is how he is trained to give his indication." However, when asked whether Kaz is trained to do a specific thing or is able to pick and chose what he wants to do, Trooper Koltz stated, "I don't know. I don't know if it's trained to do a specific thing. I don't know." Nonetheless, according to Trooper Koltz, whether or not Kaz indicates in any given situation depends to some degree on his interpretation of Kaz's behavior.[5] The location of the scent is also important. As both Koltz and Huntimer explained, in pursuing a scent, the dog believes it is going after a drug scented toy, the purported source of the odor that it must get out of the place it is located. That is its training. Hence, the scratching and biting, or barking if the dog cannot reach the source. In effect, the dog is searching for the odor, not necessarily the drug itself. The dog's behavior will be affected by the place where it believes the toy is hidden. An example Sergeant Huntimer offered was if the dog found the scent on or near barb wire, the dog has enough sense not to jump up on or bite the barb wire, it will not do it, but it will bark at it as its aggressive response.

[¶27.]        There was some conflict in the evidence. Trooper Koltz explained to the court why Kaz did not scratch in this case. He testified that scratching behavior is no longer permitted because of the risk of damage to property. This ban, according to the trooper, came from his supervisor with the highway patrol. Thus, if the dog appears to be ready to jump on or scratch a car, the trooper will pull it off

---

5.      In response to questions from defense Counsel, Trooper Koltz stated:
        Q: Is it left to interpretation?
        A: Yes, I think it is. As an expert and as a handler of that dog I am looking for certain things. I am looking for the stiffening of the body. I am looking for the snap of the head, along with the biting, barking, or scratching. One of these three[.]

before it begins. However, Sergeant Huntimer, who is "in charge of the dog training unit and also in charge of training and certifying dogs throughout the state and region," testified that he was unaware of the ban and that he had only heard rumors. He further testified that he has not changed the manner in which he conducts training or how he instructs handlers, including Trooper Koltz, with reinforcing their aggressive response behavior.

[¶28.] Sergeant Huntimer explained in detail how Kaz is trained as an aggressive responder. According to the sergeant, dogs are either trained as passive or aggressive indicators. Passive indicators, the preferred indication of defense expert Dr. Craig, are not necessarily superior according to Sergeant Huntimer.[6] Instead, he said that the specific training regime depends on the dog and how the dog reacts, but that one is not better than the other. Based on his training of Kaz, he stated that depending on the circumstances, Kaz might indicate by biting, barking, or scratching. As Sergeant Huntimer explained, the dog is "trained to get the toy out because the odor is on that toy[;] they are actually digging it out of the location of where it's at." Thus, the dog's indication is going to be behavior consistent with attempting to get the toy out of where it smells the strongest scent.

[¶29.] Sergeant Huntimer criticized some of Dr. Craig's conclusions, saying that some of his points were "outdated" and that dog training has undergone "a lot of changes even in the last two to three years." Huntimer also testified that

---

6. As a passive indicator, or a sit responder, as Dr. Craig termed it, a dog's "defined final response" would be to sit "at the location as close as he can get to the highest odor concentration that he can get to."

differences between Dr. Craig's approach and his approach can be explained by their different training styles. Huntimer's training method with aggressive dogs of "digging out" the toy reinforces behaviors such as scratching and biting. But, in interpreting the dog's response, an officer looks for more than biting or scratching. The entire sequence of behaviors must be observed:

> We can't go search everything that the dog bites or sits on. We have to see everything. We have to see that the dog is in odor. That he is changing his body posture. That he is finishing up with that indication. Now we are going to search because we've seen everything.

[¶30.] From his review of the video in this case, Sergeant Huntimer opined that Kaz indicated at the trunk of Nguyen's vehicle by his aggressive response of biting in the area he detected the scent he was trained to find. Accordingly, he stated that Kaz's behavior informed Trooper Koltz that Kaz believed the strongest odor existed at the trunk.[7]

---

7. Sergeant Huntimer testified:
Q: If he's displaying that aggressive behavior, he's going to scratch?
A: Not necessarily. There's times that the dog can't scratch.
Q: I am not talking about when it's crawling under a car right now. I'm talking about what I saw on that tape. The dog wasn't underneath the car. The dog had an opportunity and yet it never makes an effort to scratch at any time going around that vehicle. That's contrary to its training in which he is trained to scratch when he smells the target odor; is that not true?
A: That's not true. The dog bit the trunk and he bit it on several occasions. To him that trunk could have been the toy, that's where the odor was. As far as he's concerned that is where the odor was coming from. Where he bit in his mind could've been the toy. So in his mind, it's right here and I'm biting it. So he did bite it on several occasions.
Q: Well, you're suggesting that the dog is making a lot of decisions, if that were—well, we know this for a fact, the dog is trained to scratch, specifically, trained in that behavior and you have testified to that fact. Correct?

(continued . . .)

[¶31.]     The video clearly shows that Kaz did not attempt to scratch the vehicle at any time. However, Kaz can be seen biting at the trunk area. There is certainly conflicting evidence in this case on whether this biting amounts to an indication. In sorting out the evidence and the testimony explaining Kaz's behavior, the trial court concluded that Kaz indicated the odor of an illegal substance while at the trunk of Nguyen's vehicle. With respect to Kaz's indication, the court stated in its oral findings that

> Kaz's obvious excitement and enthusiastic biting cannot be reasonably characterized as subjective canine behavior. . . . The behavior that I see in that videotape . . . does meet the requirement of being an objectively observable indication by the dog that drugs are probably present. . . . [The] dog was visibly excited and aggressive towards the vehicle's trunk. Now, there is something that's been made, I think probably legitimately so, that this was not scratching, this was biting. But the [S]tate has explained that, and it certainly makes sense to the [c]ourt, that if we are going to have dogs scratching at all of these vehicles, the highway patrol will have to put about 25% of their allotted funds into repairing citizens' vehicles, so the fact that this is an aggressive responder, that he was either biting or scratching, was sufficient in the eyes of the [c]ourt.

[¶32.]     While Nguyen does not dispute that Kaz bit at the trunk, she nevertheless asserts that the trial court's findings are clearly erroneous. According to Nguyen, the only evidence in the record that Kaz was trained to give an indication by biting or barking was provided by Trooper Koltz and Sergeant Huntimer. The court's reliance on this evidence, Nguyen asserts, was clearly

---

(. . . continued)
    A: Yes, he's been rewarded for scratching.
    Q: And we know for a fact that he never does it on the search of my client's vehicle; is that true?
    A: That's true, he doesn't scratch.

erroneous because neither witness could testify about *how* Kaz was trained to respond in that manner. Instead, both Trooper Koltz and Sergeant Huntimer explained what training methods were used to reinforce Kaz's scratch responses. Nguyen further maintains that the court's reliance on Trooper Koltz's explanation of why Kaz did not scratch in this case—that scratching was no longer permitted by his supervisor—"stretches credulity beyond the point this Court should accept under the due deference standard." Therefore, Nguyen contends that any behavior besides scratching cannot be held sufficient to establish probable cause.

[¶33.]     Our question now is whether there was competent evidence in the record to support the finding that the dog indicated by biting at the trunk area of Nguyen's car. *See Lockstedt*, 2005 SD 47, ¶33, 695 NW2d at 729-30. Here, as in *Lockstedt*, the trial court was presented with conflicting expert testimony on what constitutes an indication and whether the drug detection dog indicated. In *Lockstedt*, we stated that the duty to resolve such conflicting testimony resides with the trial court and that the court's factual findings will not be disturbed unless they are clearly erroneous. *Id.* ¶14.

[¶34.]     Two experts testified for the defense, Dr. Craig and former Trooper Vlasman, and both declared that a scratch response was necessary for an indication to have occurred. However, the trial court discounted their testimony. According to the court, Dr. Craig did not have experience training dogs under the same rules Kaz was trained with, and that his experience was with the military as opposed to the highway patrol. With respect to Vlasman, the court held that his testimony was "biased based upon the circumstances surrounding his departure from the Highway

Patrol." The court concluded that it appeared to him "that he had a bit of a grudge or at least bad feelings against the highway patrol."[8]

[¶35.] The State's witnesses, Trooper Koltz and Sergeant Huntimer, both testified that Kaz's behavior of biting amounted to an indication sufficient to inform Trooper Koltz that Kaz detected the odor of a controlled substance at the trunk of Nguyen's vehicle. The court specifically found Trooper Koltz's testimony to be "believable." The court also gave weight to the testimony offered by Sergeant Huntimer that Kaz's responses as an aggressive indicator will depend on the circumstances, unlike a passive, or sit indicator, who will have but one response.[9]

---

8. Vlasman directly contradicted Trooper Koltz and Sergeant Huntimer in saying that Kaz was trained and reinforced to scratch, bark, or bite as an indication. He said that the dog was only trained to scratch. However, he conceded that barking and biting were "incidental" to scratching. Moreover, he testified that based on Kaz's behavior at the back of Nguyen's car, "you can obviously see Kaz do the alert on this vehicle, I would have searched the vehicle." But his search would have been based on an Attorney General opinion that an "alert" was sufficient probable cause.

9. Sergeant Huntimer then identified for the court, in detail, Kaz's movements and responses throughout the video:

   [t]he dog came into odor on the back of the trunk and he continued to work it out so that he could find the strongest source, and when he came back around to that trunk, that's where the strongest source was after he had been all the way around the car, he stayed with it, even when the handler continued to move, the dog stayed right there on the source. . . .

   You can see the dog's change in breathing, and it might be that it's easier for me to see because I know what I am looking for, but when the dog comes around I can see his breathing start to change and you can see his body posture start to change as he comes around and his head comes back to the point where he started to smell and then he starts to stay and work it as the handler continued to move the first time around the dog continued to move also. He's looking for the strongest source. When he gets to the door seam on the passenger side you can see the same thing, the dog spins around, he's

   (continued . . .)

-19-

Based on the testimony and the video evidence, the court concluded that Kaz's indication at the trunk was objectively observable.

[¶36.]    From our review of the conflicting testimony in this case, we cannot say that the court was clearly erroneous in concluding that Kaz, as an aggressive indicator, can indicate by biting, barking, or scratching. Kaz has been trained to respond aggressively to the odor of certain illegal substances, by "digging out" the target odor. In training, it is not just the scratching behavior that is reinforced. He is reinforced when he gives "a bark, a bite, or a scratch." Although the PBS program tape definitely shows the dog scratching at a light switch where a training substance had been planted, the dog can also be seen aggressively biting at the light switch. Furthermore, as Koltz and Huntimer explained, it is not simply the dog's trained response that tells the officer the dog is indicating the presence of an illegal substance. The dog's innate responses to the target odor must precede the indication. As Koltz testified, he must watch the dog's "trained and untrained [behaviors], all together, wrapped into one," to make sure they are congruent. Here, in the video of the roadside stop, we can see the dog's behaviors in response to what it was sniffing at the trunk. Its involuntary responses preceded its biting at the trunk. Thus, considering the entire record, there was evidence to support the trial court's factual findings. We are not at liberty to override the court's credibility findings. We uphold the court's conclusion that Kaz "indicated" the presence of an

_____

(. . . continued)
        changing his head position, and he's sniffing right there, intently, and then he continues around again, and when he gets to that backside again he just walks up to that spot.

illegal substance in Nguyen's car.

[¶37.] Next we consider whether Trooper Koltz improperly influenced or cued Kaz in order to obtain probable cause. Nguyen claims that "the second time around the vehicle [Trooper Koltz] stopped and gestured to the trunk. [He] then turned and faced Kaz and repeatedly said 'gift.'"[10] "Handler's cues, such as voice or physical signals, have been recognized to compromise a dog's objectivity and impermissibly lead the dog to alert at the suspected item[.]" United States v. Heir, 107 FSupp2d 1088, 1096 (DNeb 2000) (citing United States v. Trayer, 898 F2d 805, 809 (DCCir 1990), *cert. denied*, 498 US 839, 111 SCt 113, 112 LEd2d 83 (1990); United States v. $80,760.00, 781 FSupp 462, 478 n36 (NDTex 1991)); *see also Outlaw,* 134 FSupp2d at 813.

[¶38.] Both Dr. Craig and Sergeant Huntimer agreed that cuing would be inappropriate. Yet they disagreed on whether Trooper Koltz cued Kaz with a hand gesture or the repeated use of the word "gift." According to Dr. Craig, the use of hand gestures, or the word "gift" should not occur in the field.[11] Cuing, therefore, would only be appropriate when the dog is first being trained. Sergeant Huntimer, on the other hand, testified that using the word "gift" is not cuing. Rather, he

---

10. Pronounced "geeft," the word "gift" is German for poison or venom. According to Sergeant Huntimer, when the trooper uses the word "gift" he was telling Kaz to look for the odor, find the odor he is trained to detect. The dog associates the word "gift" with the toy it is rewarded with when it is successful in locating the source of a target drug odor.

11. In support of his position that Trooper Koltz tried to encourage the dog to indicate at the trunk, Dr. Craig testified, erroneously, that Trooper Koltz touched the dog on its side before Kaz started his biting behavior. But, as

(continued . . .)

characterized it as a verbal command and indicated that the trooper did not cue Kaz by using the word "gift." He also testified that based on his review of the video, Trooper Koltz did not gesture to Kaz with his hand, tap on the vehicle with his hand, or direct Kaz to indicate in any particular area. Trooper Koltz's hand, according to the sergeant, remained in the same non-suggestive position throughout the entire walk around the vehicle. Thus, his hand position merely provided Kaz a search pattern.

[¶39.]     After listening to the conflicting evidence and watching the video, the trial court concluded that Trooper Koltz did not cue Kaz. In its oral findings, the court stated, "I believe that what the trooper was doing, he was giving a search pattern for the dog and was not cuing. . . . I find that there was not a cuing." However, Nguyen claims that the court only addressed the issue of whether Trooper Koltz gestured to Kaz with his hand. While the court did not specifically address Nguyen's assertion that the use of the word "gift" is cuing, the court's ultimate conclusion was that "there was not a cuing." Because the court heard evidence from both sides concerning whether using the word "gift" is cuing, we cannot say that the court did not consider this factor when making its conclusion that cuing did not occur. Sergeant Huntimer, who trains and tests Kaz and Koltz, testified that using the work "gift" during a search is not cuing. With due deference to the trial court's better position to gauge the demeanor and credibility of the witnesses, we cannot

_____

(. . . continued)

seen on the videotape, the sequence is just the opposite. The Trooper did not touch the dog until after he began his biting at the trunk area.

say that the court's findings were clearly erroneous. As the trial court said, "These facts enter the realm of objectivity because the dog's aggressive response to the trunk is, I believe, clearly seen in the videotape." Our own review of the video in light of the testimony accepted by the court suggests nothing to justify overturning the court's findings.

### 3. Conclusion

[¶40.]      In deciding whether probable cause existed to justify a search, we avoid a hyper-technical analysis, detached from the realities of life. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. . . . Rigid legal rules are ill-suited to an area of such diversity." Illinois v. Gates, 462 US 213, 232, 103 SCt 2317, 2329 76 LEd2d 527 (1983). Absolute certainty or proof beyond a reasonable doubt is not required under the Fourth Amendment. We must ask only, was there a "fair probability that contraband or evidence" would be found in Nguyen's car? See id. at 238, 103 SCt at 2332, 76 LEd2d 527. Considering the totality of circumstances, including Nguyen's nervous demeanor, her oblique explanation of her occupation (she buys things for people), the drug dog's response to her of biting on his kennel mat in the patrol vehicle, and the dog's indication at the trunk of her car, we believe the officer had probable cause to search her vehicle.

[¶41.]      Affirmed.

[¶42.]      GILBERTSON, Chief Justice, concurs.

[¶43.]      ZINTER, Justice, concurs with a writing.

[¶44.]      SABERS and MEIERHENRY, Justices, dissent.

ZINTER, Justice (concurring).

[¶45.]        In this case, the dog sniff issue only involves questions of fact. The suppression hearing took three days and is evidenced by 487 pages of transcript. Four expert witnesses battled point for point over every fact of consequence, even including what an objective observer supposedly can and cannot see on the videotape. Based on this extensive and conflicting factual record, the circuit court could have decided this case either way. In the end, the circuit court explained why it adopted the State's expert's opinions; why it rejected the defendant's experts; and how it resolved the remaining conflicts of fact.

[¶46.]        Although the dissent voices understandable concerns and further acknowledges the clearly erroneous standard of review, its opinion is premised entirely on assertions of historical fact and opinion that were rejected by the circuit court. Moreover, it adopts its contrary appellate findings without analyzing or even acknowledging most of the facts and opinions that support the circuit court. Thus, the dissent assumes as historical fact, rejected assertions including:

> 1) The drug dog gave an "admittedly nonaggressive response."
> 2) The dog "has been inaccurate in detecting drugs almost 50% of the time."
> 3) The dog received "encouragement from the officer" to respond.
> 4) "[N]othing about [the dog's] bumper biting could be viewed as 'aggressive behavior.'"
> 5) "What [the dog] does in the video is not an indication."
> 6) "Thus, we are left without an observable 'indication,' only the subjective interpretation by the trooper of what he thinks the dog was about to do."
> 7) This case is governed by a "'new' untrained response. . . ."
> 8) "[N]o matter how many experts testified concerning their interpretations of the video. . . the dog's actions do not constitute an aggressive indication."

9) "[The dog's] reaction of biting the fender does not constitute aggressive indication and... does not establish probable cause."

*Infra* ¶¶49, 53-55.

[¶47.] Obviously, had the circuit court adopted any of these assertions, or, had these assertions not been directly controverted by substantial evidence, this would be a different case. However, this is not such a case. On the contrary, the Court's opinion meticulously details the evidence supporting the circuit court's findings.

[¶48.] Therefore, applying the correct standard of appellate review, I concur.

MEIERHENRY, Justice (dissenting).

[¶49.] I disagree with the majority that the drug dog's admittedly nonagressive response as recorded in the video supports a finding of probable cause. The officer determined probable cause to open the trunk existed when his drug dog, that has been inaccurate in detecting drugs almost 50% of the time, circled the vehicle, paused at the back of the vehicle and after encouragement from the officer merely nipped indistinctly at the bottom of the bumper even though the dog was trained to react aggressively when detecting drug odors. This is another questionable drug dog case leading down a slippery slope towards diminishing a citizen's protection against unreasonable search and seizure guaranteed under the United States and South Dakota Constitution.

[¶50.] Probable cause to search is judged against an objective standard. The United States Supreme Court has described probable cause to search "as existing

where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. U.S., 517 US 690, 696, 116 SCt 1657, 1661, 134 LEd2d 911 (1996). The Court also said that "the probable-cause standard is a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Maryland v. Pringle, 540 US 366, 124 SCt 795, 800, 157 LEd2d 769 (2003) (quoting Illinois v. Gates, 462 US 213, 231, 103 SCt 2317, 76 LEd2d 527 (1983)). Thus, in our review, our standard is that of a reasonable and prudent person. Additionally, decisions approving the use of dogs to detect narcotics in traffic stops presupposes "the use of a well-trained narcotics-detection dog-one that 'does not expose noncontraband items that otherwise would remain hidden from public view.'" Illinois v Caballes, 543 US 405, 409, 125 SCt 834, 838, 169 LEd2d 842 (2005) (citing U.S. v. Place, 462 US 696, 707, 103 SCt 2637, 2644, 77 LEd2d 110 (1983)).

[¶51.]      It is obvious that dogs can be of great assistance to law enforcement in detecting such things as drugs or bombs. Anyone that has been around dogs knows that dogs can be trained to react to smells by exhibiting very obvious actions such as growling, barking, scratching, pointing, sitting, lying or other trained behavior. These trained reactions are of such a nature that even a casual observer could recognize that the dog was reacting to something, perhaps pointing at a bird in the brush, barking at an intruder, or scratching at the trunk of a vehicle. In fact, officers regularly bring their dogs to citizen groups to demonstrate the drug sniffing skills of their dogs. Inevitably the trained dogs react in a manner obvious to the

crowd. A video shown on South Dakota Public Broadcasting (SDPB) demonstrating this particular dog's skills was introduced into evidence. In the SDPB video one can see the dog clearly, overtly and aggressively reacting to the smell of drugs hidden in the wall behind a light switch. The dog became extremely animated, began to bark, and jumped up on the wall to scratch at the light switch. A reasonable and prudent person could easily have concluded that the dog detected an odor of drugs behind the light switch just by watching the dog's behavior.

[¶52.]     Why is it then so difficult to determine if this same trained drug dog actually is indicating when out in the field? Why does the dog's reactions in the field become so obscure that we need experts on either side to interpret what the dog is "thinking?" *See supra* ¶28, n 6. Common sense should tell us that when "a well-trained narcotics-detection dog" does not react by exhibiting its trained aggressive response, the dog's behavior fails to provide probable cause to open a citizen's trunk.

[¶53.]     A review of the trooper's video tape shows nothing close to aggressive scratching or biting or barking by Kaz. The sniffing dog circles the vehicle, pauses in spots but never scratches. It pauses briefly at the trunk of the vehicle and only after the officer says "gift" to the dog does it show an interest in the trunk and then only by very briefly nipping at the bumper part of the vehicle under the trunk. The majority opinion describes what happens in the video.

> When [the dog] approaches the trunk area, Kaz stops. This time his body becomes perpendicular to the vehicle. Kaz continues to actively sniff the trunk area, moving his nose up and down, with his tail wagging. Trooper Koltz leaves slack in Kaz's leash, and can be seen looking at Kaz. The trooper mouths some words.

> Kaz then appears to be biting at the fender part of the vehicle under the trunk.

*Supra* ¶8. Kaz's response is clearly different from his response to drugs in the SDPB video. In fact, nothing about Kaz's bumper biting could be viewed as "aggressive behavior."

[¶54.] Although the dog's reaction to Nguyen's vehicle is not an observable aggressive indication, the majority determines that the trial court's finding is not clearly erroneous. The only evidence that the nibbling on the bumper constituted an indication by Kaz came from the officer's subjective interpretation of the dog's behavior. Even the trooper admitted that Kaz did not aggressively indicate but explains that Kaz would have but for the trooper pulling him away and placing him back in the patrol car. The trooper's claim was that he stopped Kaz from scratching the trunk because of some unofficial rumored rule, the likes of which were not offered into evidence. Under these circumstances, the trial court's findings that Kaz's behavior provided probable cause is clearly erroneous. In fact, it appears that the trial court interchanges the terms "alert" and "indication" and considered an "alert" sufficient to constitute probable cause. The trial court made the following findings:

> 41. Once a trained drug dog alerts to the odor of drugs from a lawfully detained vehicle, an officer has probable cause to search the vehicle.
> 42. Trooper Koltz had probable cause to search Tam Thi Thu Nguyen's vehicle based upon the objectively observable indication of his properly trained and certified drug detection dog, "Kaz."

Perhaps, Kaz's biting at the fender was an "alert." In the vernacular of the trainers, an alert is different from an indication, and only an indication actually signifies

#23613

that the dog smells drugs. What Kaz does in the video is not an indication. If he was about to indicate, he was prevented from doing so according to the trooper's own testimony. Thus, we are left without an observable "indication," only the subjective interpretation by the trooper of what he thinks the dog was about to do. When a "well-trained narcotics-detection dog" smells drugs, its trained response should be obvious not only to its handler but also to a reasonable and prudent person.

[¶55.]		To approve probable cause under the facts of this case turns the standard from the objective standard of a reasonable and prudent person to a subjective standard based upon the personal interpretation and belief of the officer. Any drug dog response observed by the officer could constitute probable cause as long as the officer testified that he believes that the "new" untrained response, barely visible to anyone but the officer, meant the dog had indicated. No matter how many experts testify concerning their interpretations of the video, the video stands on its own. Any reasonable and prudent person can see that the dog's actions do not constitute an aggressive indication. Any finding to the contrary is clearly erroneous. If the drug dog does not react as it was trained to react, the dog's other canine behavior cannot establish probable cause. In this case there is no dispute that the dog was trained to indicate aggressively. Kaz's reaction of biting the fender does not constitute aggressive indication and, as a matter of law, does not establish probable cause.

[¶56.]		What is at stake here is a citizen's constitutional right against unreasonable search and seizure. The facts must be such as to warrant a

reasonably prudent person to believe that probable cause exists.  I would reverse and remand on this issue and leave for another day the issue on certification.

[¶57.]　　　　SABERS, Justice, joins this dissent.