#24643-a-DG

**2009 SD 74**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

  v.

JOHN VINCENT GUERRA,                          Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE MERTON B. TICE, JR.
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

ANDREW KNECHT
Assistant Attorney General
Pierre, South Dakota                          Attorneys for plaintiff
                        and appellee.

BRUCE H. ELLISON
Rapid City, South Dakota                          Attorney for defendant
                        and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON NOVEMBER 3, 2008

OPINION FILED **08/19/09**

#24643

GILBERTSON, Chief Justice

[¶1.] A drug dog search conducted during a routine traffic stop led to the discovery of over 200 pounds of marijuana in Defendant's rental car. Defendant was charged with Possession of Marijuana with Intent to Distribute, More than One Pound. Defendant moved to suppress evidence seized claiming (1) the dog and handler were deployed in violation of state statutes and regulations and the statutory violation required suppression of the evidence, (2) that the drug dog did not properly indicate to Defendant's car, and (3) that a drug dog that alerts to the odor of drugs and not the presence of drugs is not sufficiently reliable to establish probable cause adequate for a warrantless search. Defendant's motion to suppress was denied, and he was convicted and sentenced to fifteen years in the state penitentiary with eight years suspended. We affirm.

## FACTS

### *The Statutes and Regulations*

[¶2.] In 2004, a legislative mandate to set training and certification standards for all canine units in the state, including drug detection, bomb and explosives detection, and search and recovery dogs, was given to the Law Enforcement Officers Standards Commission (Commission) per the provisions of SDCL 23-3-35(14), -35.4, and -35.5.[1] The Commission then enacted administrative

---

1. SDCL 23-3-35(14) provides in relevant part: "In addition to powers conferred upon the law enforcement officers' standards commission elsewhere in this chapter, the commission may: . . . (14) Certify canine teams."

   SDCL 23-3-35.4 provides in relevant part: "Each law enforcement canine team in the state shall be initially certified and annually recertified[.]"

   (continued . . .)

-1-

rules including standards for testing, training and certification. Under the rules promulgated by the Commission, a canine team was required to be re-evaluated and certified annually by an approved canine judge. Upon completion of the testing and certification with a passing score, the canine judge was required to forward the evaluation and results to the Commission for it to issue the certification. Testing and certification standards were compiled in a publication entitled the South Dakota Police Canine Association, Inc., Certification Teams Student Handbook (Handbook). The Handbook and its requirements became effective on June 9, 2005.

[¶3.] South Dakota State Highway Patrol Officer Matt Oxner and his drug detection dog, Keya, were originally certified on April 4, 2003. The April 2003 certification was completed by the City of Sioux Falls Police Department, and was valid through April 4, 2004. The team was subsequently recertified the following year by the Nebraska State Patrol on January 10, 2005. That certification was valid for one year and set to expire on January 10, 2006. Oxner and Keya's next recertification was required to be in compliance with the Commission's administrative rules and the Handbook, as both became effective June 9, 2005.

[¶4.] On December 12, 2005, Keya and Oxner received training and were evaluated by Nebraska State Patrol Sergeant Andrew Duis, a canine judge authorized by the Commission to administer the South Dakota evaluation. Duis

---

(. . . continued)

Subsection -35.5 provides in relevant part: "The commission shall, by rules promulgated pursuant to chapter 1-26, establish standards and criteria for canine certification and recertification." SDCL 23-3-35.5.

used the Nebraska testing standards, which were taken from the International Congress of Police Service Dogs (ICPSD)[2] standards, rather than the South Dakota standards as contained in the Handbook. Duis used a Nebraska score sheet rather than a South Dakota score sheet as required by the Commission's rules.

[¶5.] Duis's score sheet for Oxner and Keya was not submitted to the Commission following the evaluation as required by the Handbook. Instead, on March 25, 2006, Duis finally sent the score sheet to Lieutenant Scott Sheldon, the supervisor of the South Dakota Highway Patrol police service dog unit. Duis never sent the score sheet directly to the Commission. Sheldon was not a canine judge at the time of the December 12, 2005 testing, but was present during Keya and Oxner's evaluation. Sheldon used Duis's one-page Nebraska score sheet to make entries on the seven-page South Dakota form. Sheldon was unable to complete 123 of the 147 entries on the South Dakota score sheet for lack of information.

[¶6.] The Commission reviewed the South Dakota score sheet for the first time on June 9, 2006. The Commission issued a certificate to Oxner and Keya sometime after its review, which was backdated to December 12, 2005, the date of the examination by Duis.

***The Drug Detection***

[¶7.] On March 27, 2006, John Vincent Guerra (Defendant) was driving a rented Buick on Interstate 90 just east of Rapid City. Defendant was stopped by

---

2. According to Duis's testimony, sixty percent of all canine teams are trained and certified under the standards issued by the International Congress of Police Service Dogs.

Oxner who clocked Defendant on radar going sixty-eight miles per hour in a sixty-five mile per hour zone.

[¶8.]    During the traffic stop, while the radio check of Defendant's driver's license and criminal background check was being processed, Oxner informed Defendant that Oxner would be conducting a drug dog sniff of the exterior of Defendant's car. Oxner asked Defendant if Keya would detect any illegal drugs. Defendant replied in the negative. When asked whether there was anything in the trunk of his car, Defendant replied "Just some luggage." When asked how many pieces, Defendant replied "Couple," and later "About two, yeah."

[¶9.]    A videotape of the drug sniff was made by Oxner's onboard video recorder. Oxner's body microphone, however, malfunctioned and recorded without sound. The video showed Oxner exiting his patrol vehicle and circling Defendant's car in a counterclockwise motion while Keya remained in the car. Oxner then removed Keya and starting at the driver's side rear corner of the vehicle walked Keya around the vehicle counterclockwise while Oxner led the way and Keya moved with her body parallel to the car. Oxner moved one hand up and down to get Keya to smell high and then low as she circled the vehicle. Oxner then turned around at the front of the vehicle and walked Keya around clockwise and again gestured high and low to Keya while she walked with her body parallel to the car. Oxner would later testify that Keya indicated to the front passenger side door on the second pass just before Oxner turned to make a third pass, but that Keya "left it." This indication was not visible on the videotape due to the camera angle; nor can Keya's

body be seen to judge whether she remained parallel to the car or turned perpendicular as she was trained to do when indicating.

[¶10.] Oxner then walked Keya around the vehicle once more in a counterclockwise pattern moving more slowly on this last pass than on the previous ones. Oxner's search pattern was from the front of the car, to the driver's side, and finally to the passenger side while he continued the high and low hand gesture. The angle of Defendant's vehicle partially blocked the camera's view of what happened next, although it is clear that Oxner and Keya both stopped moving forward at this time. The next thing clearly visible on the video is Keya being forcibly removed from the passenger side door by Oxner and pulled onto the shoulder of the interstate, as well as her determination to remain by the door.

[¶11.] Oxner returned to his patrol car and placed Defendant in handcuffs before commencing a search of the vehicle. Oxner discovered two large packages of marijuana hidden under a black felt cover placed across the floor in front of the rear passenger seat. Seven more large packages of marijuana were discovered in the trunk.

### *The Suppression Hearing*

[¶12.] Defendant filed a motion to suppress all evidence seized as a result of the drug dog search. In that motion, Defendant challenged Oxner and Keya's December 12, 2005, recertification as untimely and for failure to comply with the requirements in the Handbook. Defendant argued that the December 12, 2005, recertification was invalid because Keya had failed one testing scenario, Duis used Nebraska testing standards and forms, Nebraska scores were extrapolated into the

South Dakota testing form, and the Commission failed to issue the canine team's certification prior to January 10, 2006. Defendant further argued Keya was not deployable in the field per the Commission's administrative rules. Defendant also attempted to use Oxner and Keya's field records to show that Keya was unreliable and, therefore, that the alert to Defendant's car was insufficient to establish probable cause. Finally, Defendant challenged whether Keya alerted to the odor of drugs in Defendant's car as claimed by Oxner, arguing that Oxner either cued or blocked Keya and caused her to alert.

[¶13.]     Oxner testified at the suppression hearing. He acknowledged he attended the December 12, 2005, recertification, but also testified that he did not receive a copy of his testing scores. Oxner also testified he was not told that he and Keya flunked any of the testing scenarios, or that retraining was required. Instead, Oxner testified the paperwork was mailed to the Commission in Pierre and the Commission eventually issued his certification, which remained valid until December 12, 2006. Oxner testified that he and Keya had never failed a recertification examination in the four and one half years that they had been paired as a drug detection team.

[¶14.]     Duis also testified at the hearing. Duis testified that a dog that fails one of the seven scenarios during an evaluation is not automatically scored as failing the entire certification process under the Nebraska/IPCSD standards. Rather, it was the summary of the entire test and not an individual scenario that controlled the ultimate decision to pass or fail a particular drug detection team. Duis testified that in his opinion as a certified canine judge, Keya was "better than

fine" in drug detection based on Duis's observations. Duis testified Keya was "commendable. She's a very reliable dog."

[¶15.] Sheldon also testified at the hearing. Sheldon testified that Duis, as a Nebraska dog certification judge, had the discretion to utilize the Nebraska score sheet rather than the South Dakota score sheet, yet conceded that the discretion did not appear in any of the Commission's rules or in the Handbook. According to his testimony, after Oxner and Keya's test was scored by Duis using the Nebraska score sheet, Sheldon transferred those scores to a South Dakota score sheet leaving most of the South Dakota score sheet blank except for the overall scenario scores and a cumulative score for the team. Sheldon also testified that in the end, however, the purpose of the certification score sheet was to ensure that a canine team received a cumulative score of four point zero or less in order to be certified and that failure on one scenario would not preclude a canine team from deployment.

[¶16.] Sheldon further testified that a canine team was considered certified and deployable in the field at the point in time that it passed its annual recertification and training examination. Sheldon conceded that there was no language in the Commission's rules or the Handbook that indicated a canine team was certified at the time it passed the recertification examination. However, Sheldon testified this was the customary practice employed by him in his capacity as the supervisor of the SDHP police service dog unit for several years prior to and after the enactment of the new statutory scheme, rules, and Handbook.

[¶17.] Sheldon also testified that he was the individual who made the determination at the time of the annual certification and training as to whether a

team was deployable. He further testified that he had in the past determined canine teams were not deployable for failure to timely recertify. This occurred in December 2006, and was due to a scheduling conflict with Duis. Sheldon notified all drug dog teams whose annual certifications expired on December 14, 2006, that they were not deployable for approximately one week until certification could be rescheduled the following week. Sheldon also conceded that there were no rules or Handbook sections that delegated to him as the supervisor of the SDHP police service dog unit the authority to determine whether a canine team was or was not deployable.

[¶18.]    Bryan Gortmaker, assistant director for the South Dakota Division of Criminal Investigation and secretary of the Commission, also testified at the suppression hearing. Gortmaker testified that certification occurred at the time the canine team passed the annual recertification examination. Gortmaker also testified that he was the person who received signed score sheets and verified their content, and then instructed a staff member to prepare certificates for signature by the Commission. He also testified that the rules specifically provide that only the Commission can certify a canine team.

[¶19.]    Defendant's motion to suppress all evidence seized was denied by the trial court. Defendant was found guilty on the one count of Possession of Marijuana with Intent to Distribute, One Pound or More in violation of SDCL 22-42-7. He was sentenced to the South Dakota State Penitentiary for a period of fifteen years, with eight years suspended.

[¶20.]     Defendant raises the following issues on appeal:

1.     Whether a well trained and certified drug detector dog that alerts to the odor of drugs rather than the actual presence of drugs can provide probable cause sufficient to justify a warrantless search of a vehicle for drugs.

2.     Whether suppression of evidence is the proper remedy when law enforcement uses a drug dog that is not properly recertified in compliance with the statutory and regulatory scheme for canine teams.

3.     Whether the trial court erred when it found that an indication by a drug dog where no drugs were subsequently found is not a false indication and not counted against a dog's reliability determination.

4.     Whether the trial court erred when it determined that the drug dog indicated and thereby provided probable cause sufficient to justify a warrantless search of Defendant's vehicle.

[¶21.]     We decline to address Issue 1, as it was fully reviewed and resolved by this Court in *State v. Nguyen*, 2007 SD 4, 726 NW2d 871. Issue 3 is a restatement of Issue 1 that we also decline to address. Under South Dakota law, a dog that is trained to detect the odor of drugs, rather than the presence of drugs, is sufficiently reliable to support probable cause for a search by virtue of its training and certification. *Id*.

**STANDARD OF REVIEW**

[¶22.]     The interpretation of a statute is a question of law to be reviewed under the de novo standard of review. Discover Bank v. Stanley, 2008 SD 111, ¶15, 757 NW2d 756, 761 (citing Martinmaas v. Engelmann, 2000 SD 85, ¶49, 612 NW2d 600, 611). The construction and interpretation of an administrative rule is also subject to the de novo standard of review. Westmed Rehab, Inc. v. Dept. of Social

Services, 2004 SD 104, ¶5, 687 NW2d 516, 518 (citing Nelson v. South Dakota Bd. of Dentistry, 464 NW2d 621, 624 (SD 1991)).

> In reviewing a motion to suppress based on an alleged violation of a constitutional right, we utilize the de novo standard. State v. Rechtenbach, 2002 SD 96, ¶6, 650 NW2d 290, 292 (citing State v. Hodges, 2001 SD 93, ¶8, 631 NW2d 206, 209). Findings of fact are reviewed under the clearly erroneous standard. Hodges, 2001 SD 93, ¶8, 631 NW2d at 209. "Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo." State v. Hirning, 1999 SD 53, ¶8, 592 NW2d 600, 603 (citing Spenner v. City of Sioux Falls, 1998 SD 56, ¶13, 580 NW2d 606, 610).

State v. De La Rosa, 2003 SD 18, ¶5, 657 NW2d 683, 685.

[¶23.] **2. Whether suppression of evidence is the proper remedy when law enforcement uses a drug dog that is not properly recertified in compliance with the statutory and regulatory scheme for canine teams.**

[¶24.] On February 25, 2004, the South Dakota Legislature enacted SDCL 23-3-35(14), giving the Law Enforcement Officers Standards (Commission) the authority to certify canine teams. This law became effective July 1, 2004. SDCL 23-3-35. Pursuant to SDCL 23-3-35.4, the Legislature also mandates that "[e]ach law enforcement canine team in the state shall be initially certified and annually recertified in . . . : (1) The detection of the odors of drugs and controlled substances[.]" The Legislature also enacted SDCL 23-3-35.5, which provides in relevant part: "The commission shall, by rules promulgated pursuant to chapter 1-26, establish standards and criteria for canine certification and recertification."

[¶25.] On June 9, 2005, rules on canine testing promulgated by the Commission became effective. ARSD 2:01:13:01- :13:18. Rule 2:01:13:02 provides:

> No state, county, or municipal agency, and no state, county, or municipal law enforcement agency or law enforcement officer

> may use a canine to perform or assist with the performance of the specialties set forth in SDCL 23-3-35.4, unless the canine and its handler are certified *by the commission* as a canine team.

ARSD 2:01:13:02 (Emphasis added).  Furthermore, "[u]nless renewed, certification of a canine team expires one year after the date of issuance."  ARSD 2:01:13:04.  The rules also provide that all canine teams must receive training in accordance with the standards set forth in the Handbook as drafted by the South Dakota Police Canine Association.  ARSD 2:01:13:03.  In addition,

> A canine team may be certified only upon: . . . (3) Passing a skills evaluation, conducted by an authorized canine judge or if designated by the commission, a canine evaluator, to determine if the canine team can perform its duties in a manner that exceeds the minimum standards set forth in the Certification of Canine Teams Student Handbook, dated June 9, 2005, of the South Dakota Police Canine Association.

ARSD 2:01:13:03(3), 31 SDR 19, effective June 9, 2005 (current version 34 SDR 77, effective January 29, 2007).  With the adoption of the Handbook, a mandatory, statewide uniform training and certification process was implemented.

[¶26.]     The Handbook requires that a drug dog receive at least a ranking of four on a scale of one (highest) to six (lowest) on seven drug search scenarios contained in the Handbook, and an overall score of at least four to be certified as a drug detector dog.  Certification of Canine Teams Student Handbook 1, 16-17 (June 9, 2005) (current version effective January 29, 2007).  "A false response in the area searches will result in test failure."  *Id*. at 16.  In other words, the drug dog is required to pass all seven scenarios with sufficient proficiency and without giving a single false indication.

[¶27.] Recertification by passing the required skills evaluation is necessary every year. ARSD 2:01:13:05(1). "[U]pon completion of the evaluation, the canine judge or canine evaluator shall file the evaluation and results with the commission and furnish a copy to the law enforcement agency." ARSD 2:01:13:14. Only the commission is authorized to ultimately grant certification. ARSD 2:01:13:03(3).

[¶28.] The instant case requires this Court to review the issue of a drug dog team's reliability against the backdrop of this new legislation and ARSD 2:01:13:01 through: 13:18, and the Handbook enacted by the Commission. Prior to the passage of SDCL 23-3-35.4 and .5, certification of canine teams appears to have been accomplished piecemeal, with each law enforcement agency conducting its own training and evaluation. Testimony at the suppression hearing indicated that prior to the establishment of the uniform training and certification process Oxner and Keya were certified as a drug detection team by the Sioux Falls Police Department in 2003 and the Nebraska State Patrol in 2004 and again in January 2005. It is unclear what standards were used by the Sioux Falls Police Department prior to December 2005. However, the same Nebraska standards used during Oxner and Keya's January 10, 2005, recertification testing were used at the December 12, 2005, recertification.

[¶29.] This Court interprets the above legislative enactments as defining what constitutes a "properly trained and certified" drug dog detection team. Thus, a drug dog under South Dakota Codified Law is properly trained and certified only when the certification and training are conducted in compliance with the statutory

scheme, administrative rules, and the Handbook. Were we to conclude otherwise, we would in effect be improperly re-writing the statutory scheme.

[¶30.] In the instant case, the Defendant argues that the drug dog team of Keya and Oxner was not properly certified within the meaning of the requirements in SDCL 23-3-35.4, -35.5, the Administrative Rules of South Dakota Chapter 2:01:13, and the Handbook. As such, the Defendant argues Keya must be considered an unreliable drug dog due to the failure of the Commission to adhere to its rules and the relevant statutes. The Defendant's argument relies on the fact that the Commission failed to recertify the team prior to the January 10, 2006, the date the team's most recent recertification expired. Instead, the team's certification materials were reviewed by the Commission for the first time on June 9, 2006, and the team's certificate was backdated to December 12, 2005, the date the team was tested by Duis. In addition, Keya was tested under the Nebraska standards, and not the South Dakota standards adopted by the Commission.

[¶31.] The State argues that Keya was reliable based on the results of the testing conducted on December 12, 2005, and the eventual issuance of the certification by the Commission. The State further argues that the Nebraska standards and testing form used with Keya and Oxner was sufficient because both adhered to the multinational standards used by the ICPSD, which are used to train and certify approximately sixty percent of all drug dogs worldwide.

[¶32.] "Administrative rules have 'the force of law and are presumed valid.'" Sioux Falls Shopping News, Inc., v. Depart of Rev. and Reg. Ct, 2008 SD 34, ¶24, 749 NW2d 522, 527 (quoting Matter of Sales and Use Tax Refund Request of Media

One, 1997 SD 17, ¶11, 559 NW2d 875, 878) (citations omitted). "Once a rule has been adopted, it may not be amended, repealed, or suspended except by compliance with § 1-26-4 or 1-26-5, and with § 1-26-6, even if it has not taken effect."[3] SDCL 1-26-6.7. The final construction of an administrative rule is a question of law fully reviewable by this Court on appeal. *Nelson*, 464 NW2d at 624 (citing *In re* Matter of Southeastern Minn. Cit. Action Coun., 359 NW2d 60 (MinnApp 1984); Iowa Fed. of Labor v. Dept. of Job Serv., 427 NW2d 443 (Iowa 1988); *In re* Matter of Stone Creek Channel Improvements, 424 NW2d 894 (ND 1988)). However, "an agency is usually given a reasonable range of informed discretion in the interpretation and application of its own rules when the language subject to construction is technical in nature or ambiguous, or when the agency interpretation is one of long standing." *Id*.

[¶33.]        We employ the same rules of construction for statutes as we do for administrative rules. *Id*. (citing Hartpence v. Youth Forestry Camp, 325 NW2d 292 (SD 1982)). We employ rules of construction in order to discover the true intention of the statutes, which is ascertained primarily from the language used in the statutes and rules. *Discover Bank*, 2008 SD 111, ¶15, 757 NW2d at 761 (citing *Martinmaas*, 2000 SD 85, ¶49, 612 NW2d at 611). "The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used." *Id*. We

---

3.      SDCL 1-26-4 pertains to the requirement of notice, service, and a hearing prior to a rule change. SDCL 1-26-5 provides how to accomplish notice of an emergency rule change. SDCL 1-26-6 provides when a rule change is complete.

are required to give words and phrases their plain meaning and effect. *Id.* "When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed." *Id.*

[¶34.] As this Court recently noted:

> As a rule of statutory construction, we have determined that "when 'shall' is the operative verb in a statute, it is given 'obligatory or mandatory' meaning." The statutory definition of "shall" is in accord: "As used in the South Dakota Codified Laws to direct any action, the term, shall, manifests a mandatory directive and does not confer any discretion in carrying out the action so directed." SDCL 2-14-2.1. Statutes and court rules must be construed in their entirety. The effect of the word "shall" may be determined by the balance of the text of the statute or rule.

*Id.* ¶21, 757 NW2d at 761 (some internal citations omitted).

[¶35.] SDCL 23-3-35.4 and .5 require that beginning in June 2005, Keya and Oxner's annual certification be in compliance with the standards and criteria promulgated by the Commission. The term "shall" in both SDCL 23-3-35.4 and .5 makes adherence to these statutes mandatory. The standards and criteria promulgated by the Commission require the drug dog team's recertification to be in compliance with the Handbook, dated June 9, 2005, of the South Dakota Police Canine Association. ARSD 2:01:13:03(3). No other certification method was permitted by the language of ARSD 2:01:13:03(3). There was also no evidence presented at the suppression hearing to indicate that "certification" and "recertification" were technical terms or that a long standing practice of backdating certification existed.

[¶36.]     Furthermore, the Commission did not certify Keya and Oxner until June 9, 2006, when it first received and considered the training and certification test results from December 12, 2005. The original expiration date for Keya's certification was January 10, 2006. A certification expires one year after the date of issuance unless renewed. ARSD 2:01:13:04. Renewal of a certification may only be done by the Commission itself after consideration of the team's testing and training materials. ARSD 2:01:13:02. There were no provisions in the Commission's administrative rules that permitted it to backdate a certification to the date the canine team was tested. Instead, the administrative rules make it clear that certification is valid only after receipt and review of testing and training records by the Commission, who then is required to make the determination if the dog would be certified or recertified.

[¶37.]     For the period of January 11, 2006, through June 9, 2006, Keya was deployed without certification in violation of Rule 2:01:13:02, which precludes the use of an uncertified drug dog within the state of South Dakota. Despite Keya's service record, her prior certification and recertification, and Duis's opinion that Keya was an above average drug detection dog, the Commission failed to recertify the team by January 11, 2006. As such, on March 27, 2006, the date of Defendant's traffic stop and drug dog search, Keya was not certified or authorized to conduct drug dog searches in the field.

[¶38.]     The State characterizes the noncompliance of Oxner and Keya's certification process with the Commission's Administrative Rules and the Handbook as merely the way in which the Commission had delegated implementation of the

certification process. The Defendant characterizes the noncompliance as violations of the statutory scheme found in SDCL 23-3-35(14), -35.4, and -35.5, the Commission's Administrative Rules, and the Handbook. However it is characterized, it is clear that the processes described in the Handbook and the Administrative Rules are not the same as that used by the staff members charged with implementing the certification process.

[¶39.] The end result in this case is a drug dog that passed its recertification examination with a score sufficient to merit recertification by the Commission, but whose certification paperwork was not finalized prior to the time of the search in question. The result was a violation of Administrative Rule 2:01:13:02, which prohibited the use of a canine for drug detection unless certified by the Commission.

[¶40.] The Fourth Amendment of the United States Constitution does not mandate a particular method for establishing that a drug dog is "well trained" and capable of establishing probable cause. *See* United States v. Place, 462 US 696, 707, 2637 SCt 2637, 2644-45, 77 LEd2d 110 (1983). Each jurisdiction has been left to decide what constitutes a well-trained and reliable drug dog. *Nguyen*, 2007 SD 4, ¶16, 726 NW2d at 876. This Court held that in South Dakota a totality of the circumstances approach should be used to determine reliability by examining "the dog's training and certification, its successes and failures in the field, and the experience and training of the officer handling the dog." *See id*. ¶20, 726 NW2d at 877. However, the legislature has now prescribed a particular certification method. SDCL 23-3-35.5. Thus, we are faced with determining whether a statutory

violation, rather than an error of constitutional proportions, requires the exclusion of the evidence seized.

[¶41.] We have not had occasion to examine whether a violation of the statutory scheme on drug dog certification is sufficient to warrant application of the exclusionary rule. We have, however, had occasion to examine whether the violation of other statutes concerning South Dakota rules on search and seizure require application of the exclusionary rule. *See* State v. Miller, 429 NW2d 26, 34 (SD 1988) (examining whether a violation of the ten-day rule in SDCL 23A-35-4 triggered application of the exclusionary rule); State v. Jackson, 371 NW2d 341, 343 (SD 1985) (examining whether a failure to provide defendant with a signed and dated copy of a validly issued and signed search warrant at the time of the search as provided in SDCL 23A-35-10 required application of the exclusionary rule); State v. Glick, 87 SD 1, 4, 201 NW2d 867, 868 (1972) (examining whether exclusion of money and a gun found on defendant was required after law enforcement failed to comply with SDCL 23-16-1, which required that defendant receive a receipt for cash seized and a duplicate of the receipt be filed with the trial court). In these cases we first analyzed the legislative intent of the particular statute in question and then whether law enforcement's noncompliant conduct violated that intent. *Miller*, 429 NW2d at 34-35 (legislative intent of SDCL 23A-35-4 was to prevent staleness of probable cause by requiring searches based on a properly issued warrant be conducted no later than ten days from date of issuance); *Jackson*, 371 NW2d at 343 (legislative intent of SDCL 23A-35-10 requiring defendant receive a signed copy of valid search warrant was to ensure a valid, dated, and signed search warrant had

been issued); *Glick*, 87 SD at 4, 201 NW2d at 869 (legislative intent of SDCL 23-16-1 was to make law enforcement accountable for defendant's rights in money or property taken and held as evidence). Suppression is not required when the intent behind the rule has not been infringed upon and the spirit of the law has not been violated. *Miller*, 429 NW2d at 35 (holding blood, hair, and fiber evidence removed from defendant's vehicle by law enforcement on July 15 and 29 upon a search warrant issued July 3 was not in violation of the spirit of SDCL 23A-34-4 when the evidence was an integral part of the vehicle itself and not affected by the passage of time); *Jackson*, 371 NW2d at 343 (holding spirit of law not violated and warrant was in substantial compliance with SDCL 23A-35-10 when unsigned and undated copy of properly issued search warrant described premises to be searched and property to be seized and was provided to defendant at time of search rather than a true copy of the actual search warrant); *Glick*, 87 SD at 4, 201 NW2d at 868-69 (holding no prejudice resulted to defendant when no receipt provided by law enforcement for money seized at time of arrest when the money was sealed and placed into the property room at the police station and remained there until the time of trial).

[¶42.] SDCL 23-3-35.4 provides:

> Each law enforcement canine team in the state shall be initially certified and annually recertified in one or more of the following specialties:
>
> (1) The detection of the odors of drugs and controlled substances;
>
> (2) The detection of the odors of explosive materials, explosive devices, and materials which can be used to construct an explosive device;

(3) The detection of odors of any other substance or material which can be used with criminal intent;

(4) Apprehension or search skills including tracking, building suspect search, article recovery, evidence search, and suspect apprehension.

The text of the statute does not indicate suppression as a remedy for the use of an uncertified canine team. Instead, the purpose appears to be to create a uniform method of training and certifying canine units on a statewide basis. This intent becomes more apparent when considered against the backdrop in which it was enacted: no uniformity for certification existed and drug detection canine units were being trained and certified under multiple standards from multiple jurisdictions. Such a situation also turned suppression hearings into a "battle of the experts" on the issue of the dog's training.

[¶43.] In the instant case, on December 12, 2005, Oxner and Keya passed the same Nebraska recertification test they took as a team on January 10, 2005. The results of the December 12, 2005, test, computed using the Nebraska State Highway Patrol standards for drug dogs, indicated that Keya was competent to detect the odor of drugs in the field with sufficient reliability to support a determination of probable cause for a search of a vehicle in South Dakota. However, the canine unit was not properly certified within the meaning of relevant administrative regulations at the time of the sniff of Defendant's car.

[¶44.] The failure of the Commission to issue timely a certificate did not diminish Keya and Oxner's training or skills, or make the canine team less qualified in the field. While the letter of the statute was not served in this case, the spirit

and intent of the statute was never violated. Suppression, therefore, would serve no purpose. The canine team was as reliable as it was required to be under the Handbook both before and after the Commission issued the certificate as the team had been fully trained and tested in compliance with the standardized method required by SDCL 23-3-35.4. The trial court did not err when it denied Defendant's motion to suppress.[4]

[¶45.] **4. Whether the trial court erred when it determined that the drug dog indicated and thereby provided probable cause sufficient to justify a warrantless search of Defendant's vehicle.**

[¶46.] The facts of this case show it is undisputed, based on previous videotaped sniffs conducted with Keya and the testimony of Oxner and Duis, that Keya was trained as an aggressive indicator. An aggressive indicator is a dog that indicates by scratching at the location at which it detects the odor.

[¶47.] Defendant argues on appeal that the videotape of the drug sniff is insufficient to support the trial court's finding of fact that Keya indicated to the odor of drugs in the car. He does so based on the fact that the videotape does not clearly show the dog's reactions on the passenger side of the car. Defendant argues that Keya's reactions to his car were substantially different from the reactions she exhibited in other drug searches, videotapes of which were submitted at the hearing before the trial court. Defendant also argues that Oxner blocked Keya with his body and used his hand to cue her.

---

4. We also adopt and incorporate the rationale for declining to suppress from our companion decision in *State v. Britton*, 2009 SD 75, ___ NW2d ___.

[¶48.] Defendant cites to our recent decision in *Nguyen*, 2007 SD 4, ¶12, 726 NW2d at 874-75, for the proposition that this Court conducted a *de novo* review of the facts of that case. However, Defendant misstates the standard of review in that case. The question of whether probable cause existed is a mixed issue of law and fact to be reviewed *de novo*. *Id*. However, the trial court's findings of fact are reviewed under the clearly erroneous standard. *Id*. It is only the trial court's application of those facts to the issues of law that is subject to the *de novo* standard. *Id*. (citing State v. Lockstedt, 2005 SD 47, ¶14, 695 NW2d 718, 722). "The trial judge remains the sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony." *Id*. As we have previously noted: "When it comes to deciding whose testimony should be believed, a transcript is no substitute for a judge's firsthand observation." *Lockstedt*, 2005 SD 47, ¶14, 695 NW2d at 722.

[¶49.] The State argues that the trial court's findings of fact that Oxner did not cue Keya with his hand, or with his body, was supported in the record by Oxner's testimony. It further argues that the finding was also supported by Duis' testimony that he saw no activity engaged in by Oxner on the video that cued Keya. The State argues the trial court's findings of fact were supported by the evidence in the record.

[¶50.] During the suppression hearing, Oxner testified that Keya indicated twice but left the scent after her first indication. He further testified that he did not conduct any type of training with Keya to teach her to indicate in response to a hand signal. Oxner also testified that his use of hand signals with the dog were for

the purpose of indicating a search pattern intended to get the dog to sniff high and low on a vehicle, and not to cue the dog. He also testified that the use of hand signals was approved under the ICPSD standards. Oxner conceded it could be possible for him to cue the dog subconsciously. However, Oxner further testified that during his monthly training and annual recertification he was observed by fellow canine officers to identify any subconscious cuing conduct, and that he had never been told that he engaged in such conduct. Oxner further testified that he did not block Keya's path in an attempt to cause her to indicate. Rather he slowed down to give Keya the opportunity to sniff the area she had indicated and "left it" on the prior pass.

[¶51.]       Duis also testified at the hearing that he saw both indications on the video as testified to by Oxner. Duis testified that he did not observe any conduct by Oxner that could be considered cuing. He also testified that he did not train any dogs or know of any dogs trained to indicate when blocked. Duis testified that attempting to train a dog to indicate when given a hand signal or blocked would be extremely difficult, as dogs are trained to indicate only to the odor of illegal drugs and are given a "toy" as a reward for finding and indicating to the odor of illegal drugs. Duis testified that he saw both indications as described by Oxner. Duis testified that sometimes a dog will lose a scent and have to go back for a more thorough sniff. Duis testified that the better way for Oxner to have handled the first indication that Keya lost was to circle back to the passenger side door and allow Keya to smell high and low at the spot at which she originally indicated. However, Duis did not feel that rounding the vehicle to complete the search pattern

and then reversing the pattern to give Keya another sniff in any way served to cue the dog.

[¶52.] Defendant's expert, Robert Gonzalez, a canine handler and trainer in the United States Army who retired in the late 1990s, also testified at the suppression hearing. Gonzalez testified that after the first year and a half of training, the hand motions used to establish a search pattern were not appropriate for a well trained dog under Department of Defense standards. However, Gonzalez acknowledged his expertise was in Department of Defense training protocols. He did not consider any deviation from those standards as acceptable training. Gonzalez further testified that he was unfamiliar with the ICPSD standards, or the fact that sixty percent of all police service dogs worldwide were trained under its protocols. He contended that the hand signals and body position used by Oxner might have caused the dog to alert, even if Oxner did not intend to cue the dog.

[¶53.] The trial court heard evidence from both sides as to whether Oxner's use of his hands and body was cuing. The trial court found that Oxner did appear to block Keya's forward movement with his body position. However, the trial court also found that it could not see the blocking as a suggestion to Keya to indicate. It further found that the use of the hand signals was consistent throughout the search and for the purpose of indicating a search pattern rather than for cuing the dog. Based on this evidence, and "[w]ith due deference to the trial court's better position to gauge the demeanor and credibility of the witnesses, we cannot say that the court's findings were clearly erroneous." *See Nguyen*, 2007 SD 4, ¶39, 726 NW2d at 883 (holding reversal is not warranted when the trial court determines which expert

witnesses are more credible on whether or not the facts of the case support a finding of cueing).

[¶54.] We are also cognizant of the ambiguity created by the videotape of the drug sniff. It was not clear to the trial court whether Keya was in odor, as she appeared substantially less excited in the instant case when compared to videotapes of other searches in which drugs were found by Keya. Despite that ambiguity, the trial court recognized that Oxner's four years with Keya enabled him to read her much better than the trial court and found his assessment that Keya was "snorting like a pig" was credible. It also recognized that Duis's considerable expertise in training and testing dogs enabled him to better determine whether Keya was alerting while searching the exterior of the car. The trial court found the credibility and experience of Oxner and Duis carried the issue as to whether Keya was alerting prior to her indication.[5]

[¶55.] Finally, the trial court considered whether Keya actually indicated. The trial court found Keya's behaviors on the tape to be subtle and inconsistent with her physical responses on other occasions. The trial court noted that "[h]aving a dog which will dramatically indicate the presence of drugs avoids any questions concerning the officer's statements that he has subjectively noted the dog's response to the existence of a controlled drug." However, it found that the testimony of

---

5. "An indication is 'a dog's trained behavior to signal its handler that a target odor is in the location being sniffed.'" *Nguyen,* 2007 SD 4, ¶22, 726 NW2d at 878 (quoting *Lockstedt,* 2005 SD 47, ¶9 n1, 695 NW2d at 721 n1). "An alert, conversely, is 'the dog's innate or involuntary response when sniffing a particular odor.'" *Id.*

Oxner and Duis that Keya indicated was credible. The trial court then noted in its written memorandum opinion: "I would note that on the return past the door, Keya had to be forcibly removed from the door based on her indication and determination to remain there for the purpose of retrieving her 'toy.'" Based on Keya's final reaction and forcible removal from her position at the door and the testimony of Oxner and Duis, the trial court found that Keya indicated.

[¶56.]　　　　Given that there was evidence in the record to support the trial court's findings of fact, we will not reverse those findings on appeal. All we have on appeal is conflicting expert testimony and the trial court's acceptance of Oxner and Duis's testimony over that of Gonzalez. That alone is not enough to warrant reversal. Finally, the fact that Keya had to be dragged away from the car, a fact clearly visible on the videotape, supports the trial court's conclusion of law that the dog indicated.

[¶57.]　　　　Affirmed.

[¶58.]　　　　KONENKAMP and ZINTER, Justices, concur.

[¶59.]　　　　MEIERHENRY, Justice, and SABERS, Retired Justice, dissent.


MEIERHENRY, Justice (dissenting).

[¶60.]　　　　I respectfully dissent. There are too many discrepancies between the certification process of this drug-dog team and the requirements of South Dakota's law to conclude that it meets the intent and spirit of the law. South Dakota law mandates that a drug dog and handler be recertified annually in compliance with the standards and criteria promulgated by the Commission. *See* SDCL 23-3-35.5.

The Commission has the sole authority to renew a certification in accordance with the promulgated rules. ARSD 2:01:13:02. The rules require the Commission to certify or recertify only after receipt and review of the team's testing and training records. There is no provision in the law or the rules that permits backdating a recertification.

[¶61.] The discrepancies between the requirements of the law and Keya's testing are numerous. Keya's certification process did not comply with the following South Dakota Drug Detection Dog Standards: (1) a certified canine judge must perform the evaluation, but Sergeant Buck Duis of the Nebraska State Patrol did not take the written test to become a canine judge as required by the rules nor did Duis testify that he was familiar with the South Dakota standards; (2) South Dakota standards require seven scenarios, but two of the scenarios were not included in Keya's examination; (3) South Dakota standards require diversions in six of the seven scenarios, but no diversions were noted on the Nebraska score sheet; (4) Handler skills 12 through 21 on all seven scenarios were not completed; (5) the Commission did not review Keya's score sheet for recertification until June 9, 2006, six months after Keya's testing and five months after Keya and Oxner's certification expired; and (6) the Commission backdated the certification.

[¶62.] I would conclude that the various deviations from the standards and procedures violate the intent and spirit of the legislation and that Keya was not properly certified under South Dakota standards. The system was established to verify the reliability of canine teams. The use of dogs and their handlers to establish probable cause to search a citizen is no small matter. Consequently, the

legislative certification system has to be taken seriously by the Commission and law enforcement.  The incentive to follow the law, promulgate rules and procedures, and manage the reliability of the drug dogs and handlers is lost if there is no risk of exclusion.  Consequently, I would reverse and suppress the evidence.

[¶63.]        SABERS, Retired Justice, joins this dissent.