#24724-a-JKK

2009 SD 75

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

v.

WILLIAM BRITTON,                          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JANINE M. KERN
Judge

* * * *

LAWRENCE E. LONG
Attorney General

JOHN M. STROHMAN
Assistant Attorney General          Attorneys for plaintiff
Pierre, South Dakota                and appellee.

ELLERY GREY of
Rensch Law Office, APLC             Attorneys for defendant
Rapid City, South Dakota            and appellant.

* * * *

CONSIDERED ON BRIEFS
ON JANUARY 12, 2009

OPINION FILED 08/19/09

#24724

KONENKAMP, Justice

[¶1.] In 2004, the South Dakota Legislature mandated that police canine teams be certified and annually recertified before they can be used to assist in law enforcement. During a traffic stop, a drug detection dog, who had not been recertified, indicated the presence of an illegal substance in the stopped vehicle and a search uncovered 155 pounds of marijuana. After the driver's motion to suppress was denied, he was convicted of possession and intent to distribute marijuana. On appeal, we conclude, first, that use of an uncertified canine team does not necessarily compel suppression of the evidence seized and, second, that the circuit court was not clearly erroneous in concluding that the drug detection dog was reliable.

## Background

[¶2.] On May 22, 2006, Defendant William Scott Britton was traveling on Interstate 90 near Rapid City, South Dakota. Highway Patrol Trooper Matt Oxner initiated a traffic stop on defendant's vehicle for following another car too closely. Defendant was informed that he would receive a warning ticket. During the stop, Trooper Oxner took his drug dog, Keya, for a walk around defendant's vehicle. Keya indicated the presence of an illegal substance near the back passenger side of the car. Defendant was placed in handcuffs, and Trooper Oxner conducted a search. The search uncovered 155 pounds of marijuana in defendant's trunk. Defendant was arrested and charged with possession of marijuana and possession of marijuana with intent to distribute.

-1-

[¶3.]     Defendant moved to suppress the marijuana evidence claiming, among other things, that Trooper Oxner and the drug dog, Keya, were not properly certified as required by SDCL 23-3-35.4(1), and Keya was not a reliable drug detection dog.  After a hearing, the circuit court denied defendant's motion.  Defendant was found guilty in a bench trial.  He now appeals asserting that Trooper Oxner and Keya were not properly certified and Keya was not a reliable drug detection dog.[1]

### Analysis and Decision

#### 1.  Canine Team Certification

[¶4.]     In recent years, federal and state courts have grappled with many contentious South Dakota cases dealing with the challenged use and reliability of drug detection dogs.  *See, e.g.*, Chavez v. Weber, 497 F3d 796 (8thCir 2007); United States v. Olivera-Mendez, 484 F3d 505 (8thCir 2007); State v. Bergee, 2008 SD 67, 753 NW2d 911; State v. Nguyen, 2007 SD 4, 726 NW2d 871; State v. Lockstedt,

---

1.     Our standard of review is as set forth in *State v. Stevens*,

> "A motion to suppress for an alleged violation of a constitutionally protected right raises a question of law, requiring de novo review."  State v. Hess, 2004 SD 60, ¶9, 680 NW2d 314, 319 (quoting State v. Herrmann, 2002 SD 119, ¶9, 652 NW2d 725, 728 (citations omitted)); State v. Tofani, 2006 SD 63, ¶24, 719 NW2d 391, 398.  Findings of fact are reviewed under the clearly erroneous standard. *Tofani*, 2006 SD 63, ¶24, 719 NW2d at 398.  Yet, "the application of a legal standard to those facts" is reviewed de novo.  *Hess*, 2004 SD 60, ¶9, 680 NW2d at 319 (citing State v. Lamont, 2001 SD 92, ¶12, 631 NW2d 603, 607 (citation omitted)).

> 2007 SD 54, ¶5, 734 NW2d 344, 346.  It stands to reason that asserted violations of statutorily protected rights should also be reviewed de novo.

2005 SD 47, 695 NW2d 718; State v. Mattson, 2005 SD 71, 698 NW2d 538; State v. Chavez, 2003 SD 93, 668 NW2d 89; State v. DeLaRosa, 2003 SD 18, 657 NW2d 683; State v. Ballard, 2000 SD 134, 617 NW2d 837; State v. Hanson, 1999 SD 9, 588 NW2d 885. At the heart of many of these cases is the question of the competence and reliability of the drug dog and its handler.

[¶5.]    In 2004, perhaps in response to these continuing questions, the South Dakota Legislature supervened with a statute requiring mandatory certification. "Each law enforcement canine team in the state *shall* be initially certified and annually *recertified* in one or more of the following specialties: . . . The detection of the odors of drugs and controlled substances[.]" SDCL 23-3-35.4(1) (emphasis added). As part of the certification process, the Legislature imposed on the Law Enforcement Officers Standards and Training Commission the mandatory duty to "establish standards and criteria for canine certification and recertification." SDCL 23-3-35.5. In June 2005, the Commission adopted standards and criteria for police canine certification. ARSD 2:01:13:01 *et seq.* These standards prohibit a "state, county, or municipal agency, and [a] state, county, or municipal law enforcement agency or [a] law enforcement officer" from *using* a canine to assist in drug detection, "unless the canine and its handler are certified by the commission as a canine team." ARSD 2:01:13:02.[2]  Certification by the Commission expires one year

---

2.    This administrative rule provides:

> No state, county, or municipal agency, and no state, county, or municipal law enforcement agency or law enforcement officer may *use* a canine to perform or assist with the performance of the specialties set forth in SDCL 23-3-35.4, unless the canine and its handler are certified by the commission as a canine team.

(continued . . .)

from the date of issuance unless the canine team renews its certificate. ARSD 2:01:13:04.

[¶6.] By forbidding the *use* of any South Dakota canine team for detecting drugs unless the canine team is certified by the Commission, the Legislature effectively declared uncertified teams legally unqualified for use. As a result, proof of certification must precede any Fourth Amendment analysis for probable cause or reasonable suspicion and the examination of a dog's reliability under the totality of the circumstances test espoused in *Nguyen*, 2007 SD 4, ¶20, 726 NW2d at 877. *See* SDCL 23-3-35.4; ARSD 2:01:13:02. This in no way alters the holding in *Nguyen*, which involved a Fourth Amendment analysis of a search conducted in March 2004, before the effective date of SDCL 23-3-35.4 and the Commission's adoption of rules regulating the use and certification of canine teams. *See* 2007 SD 4, ¶20, 726 NW2d at 877. Moreover, the certification of the dog in *Nguyen* was not in dispute. *See id.* ¶18. In sum, the Legislature, by requiring the use of only certified drug detection dogs, interjected a precondition that must be established before we reach Fourth Amendment considerations, such as reliability, in drug dog cases of the type seen in *Nguyen*, 2007 SD 4, 726 NW2d 871.

[¶7.] The first question, then, is whether Trooper Oxner and Keya were certified in compliance with SDCL 23-3-35.4 and ARSD 2:01:13:01 *et seq.* on May 22, 2006. Their certificate was not issued by the Commission until June 9, 2006, some eighteen days after the search in question here, but the certificate was

_____

(. . . continued)
    ARSD 2:01:13:02 (emphasis added).

backdated to December 12, 2005, two days before actual testing began. Defendant contends that the law mandates certification by the Commission before the canine team can be used, and the Commission did not certify Trooper Oxner and Keya until after the search. The State, on the other hand, argues that Trooper Oxner and Keya were certified the moment they passed their required skills evaluation on December 14, 2005. The fact that the certificate was not officially issued until June 9, 2006 is immaterial, the State believes, because it was backdated to December 12, 2005.

[¶8.]    We construe administrative rules with most of the same interpretive principles used to construe statutes. *Schroeder v. Dept. of Social Services*, 1996 SD 34, ¶9, 545 NW2d 223, 227-28 (citing *Hieb v. Opp*, 458 NW2d 797, 800 (SD 1990); *Hartpence v. Youth Forestry Camp*, 325 NW2d 292, 295 (SD 1982)). "When regulatory language is clear, certain and unambiguous, our function is confined to declaring its meaning as clearly expressed." *Id.* at 228 (citing *US West Commc'ns v. Pub. Util. Comm'n*, 505 NW2d 115, 123 (SD 1993) (citing *In re* Appeal of AT&T Info. Sys., 405 NW2d 24 (SD 1987) (dealing with statutory interpretation))).

[¶9.]    To recertify as a canine team, Trooper Oxner and Keya attended testing in Grand Forks, Nebraska, on December 14, 2005. The canine judge, Sgt. Andrew Duis, required Trooper Oxner and Keya to, among other things, complete seven search scenarios as part of a skills assessment. At the conclusion of the testing, Sgt. Duis gave Trooper Oxner and Keya a combined score of 1.9 on a scale of 1 to 6, with 1 being the highest score possible. According to Sgt. Duis, a score of 1.9 is very good and commendable. Sgt. Duis passed Trooper Oxner and Keya on their

skills evaluation on December 14, 2005. No request for recertification, however, was submitted to the Commission until June 2006.[3]

[¶10.] At the suppression hearing, Lt. Scott Sheldon, the head of the South Dakota Highway Patrol Canine Unit, testified that he attended the testing and evaluation in Grand Forks, Nebraska. He said that he was notified before the skills evaluation that Trooper Oxner had passed the written examination. *See* ARSD 2:01:13:05. Lt. Sheldon further testified that while at the testing in Grand Forks, he learned that Trooper Oxner and Keya passed their skills evaluation. Agent Bryan Gortmaker, executive secretary for the Commission, also testified. He explained that he personally learned, in February 2006, that Trooper Oxner and Keya passed their skills evaluation. According to Agent Gortmaker, once Trooper Oxner and Keya passed the December 14 test, he believed they were appropriately certified under SDCL 23-3-35.4.

[¶11.] Clearly, however, the rules require action by the Commission to certify and recertify a canine team. ARSD 2:01:13:02; SDCL 23-3-35.4. Certifying a canine team is one of the specifically enumerated powers of the Commission. SDCL 23-3-

---

3. The record is not entirely clear on the reason for the extended delay. However, it appears that at least part of the delay occurred when Lt. Scott Sheldon, Trooper Oxner's superior, had to await Sgt. Duis's written evaluation sheets. Thereafter, Lt. Sheldon had to transpose Sgt. Duis's scores from the Nebraska evaluation form to the State of South Dakota Drug Detection Dog Certification Score Sheets, in order to comply with the standards of the South Dakota Police Canine Association's Certification of Canine Teams Student Handbook, dated January 6, 2005. *See* ARSD 2:01:13:03(3). The South Dakota sheets were then sent to Sgt. Duis, who signed them and returned them to Lt. Sheldon for presentation to the Commission.

35(14). Passing the skills evaluation and written exam are parts in the process of becoming recertified, but if a canine team is not certified by the Commission, the canine cannot legally assist any agency or law enforcement officer with the performance of certain specialties, including drug detection. ARSD 2:01:13:02; ARSD 2:01:13:03. Only the Commission is empowered to certify under SDCL 23-3-35(3): it must "Certify persons as being *qualified* under the provisions of §§ 23-3-26 to 23-3-47, inclusive. . . ." (Emphasis added.) The rules further specify that unless renewed a team's certification expires one year after its date of issuance. ARSD 2:01:13:04. The fact that the Commission must act to certify the team is also supported by ARSD 2:01:13:17, which imposes an application fee for every recertification. If the Commission imposes a fee for applying to recertify, a team must apply for recertification, rather than simply complete certain training and skills testing, to gain recertification. *See id.*; Dudley v. Huizenga, 2003 SD 84, ¶12, 667 NW2d 644, 649 (citation omitted) ("[A]dministrative rules are construed together to make them harmonious and workable.").

[¶12.] Under the unambiguous language of the statutes and administrative rules, Trooper Oxner and Keya were not certified simply by completing their skills evaluation. Rather, Trooper Oxner and Keya were certified on June 9, 2006, the first time the Commission considered the issue of their certification. Because Trooper Oxner and Keya were not certified on May 22, 2006, South Dakota law prohibited Keya's "use" for the "detection of the odors of drugs and controlled substances[.]" *See* ARSD 2:01:13:02; SDCL 23-3-35.4(1). Accordingly, Keya was

illegally deployed as part of the law enforcement canine team during the traffic stop.

[¶13.] Now, the question becomes whether this statutory and regulatory violation requires suppression of the evidence seized. Defendant contends that "suppression of the illegally seized evidence is the proper remedy," because otherwise the certification law would be "functionally annulled." Suppression of evidence, however, is ordinarily a remedy imposed for constitutional violations. Use of an uncertified canine team is a statutory infraction. In deciding whether a law enforcement statutory violation should result in suppression of evidence, we should not use the deterrence and culpability analysis from *Herring v. United States*, __ US __, __ SCt __, __ LEd __ (2009). That case dealt exclusively with suppression for police errors of constitutional magnitude.

[¶14.] Little South Dakota precedent guides us in analyzing whether the violation of a nonconstitutional legal requirement mandates or permits exclusion of evidence. Logically, in examining the violation of a South Dakota statute, the question of sanctions should be answered by probing legislative intent. But neither the statutes themselves nor the administrative code mentions suppression of evidence as a remedy for the use of an uncertified canine team. Indeed, the violation here is a "nonconstitutional illegality" carrying no statutory sanction. *See generally* George E. Dix, *Nonconstitutional Exclusionary Rules in Criminal Procedure*, 27 AmCrimLRev 53, 71 (Summer 1989).

[¶15.] Many jurisdictions that have considered the question hold that a nonconstitutional illegality committed by a law enforcement officer will not

automatically require suppression of the evidence obtained through the illegality. Generally, for exclusion to apply at all, the violation must be substantial, intentional, prejudicial to the defendant, and "the provision violated must have been one appropriate for enforcement by an exclusionary sanction." *Id.* at 97. In Oregon, for example, in the absence of an express statutory requirement for exclusion, evidence obtained by law enforcement officers in violation of a statute will still be admissible, unless the law violated was intended "to protect citizens against unauthorized or illegal" government conduct. State v. Davis*, 666 P2d 802, 809 (Or 1983). A court should suppress if it would effectuate the purpose of the statute. State v. Porter*, 817 P2d 1306, 1311 (Or 1991).

[¶16.] Until last year, Wisconsin examined the issue under a different standard. State *ex rel.* Peckham v. Krenke, 601 NW2d 287, 292 (WisCtApp 1999), *overruled by* State v. Popenhagen, 749 NW2d 611, 625-26 (Wis 2008). In *Peckham*, the court ruled that no exclusion should be ordered unless there was a violation of a "statute or administrative rule that expressly or impliedly provided for the exclusion of such evidence." *Id.* at 295. In overruling *Peckham*, the Wisconsin Supreme Court wrote "that evidence obtained in violation of a statute (or not in accordance with the statute) may be suppressed under the statute to achieve the objectives of the statute, even though the statute does not expressly provide for the suppression or exclusion of the evidence." *Popenhagen*, 749 NW2d at 625-26. Still, several courts hold to the view that only constitutional violations will permit exclusion of evidence. *See, e.g.,* State v. Bussard, 760 P2d 1197, 1203 (IdahoCtApp 1988); State v. Johnson, 318 NW2d 417, 437 (Iowa 1982) (refusing to exclude

relevant evidence by applying exclusionary concept to nonconstitutional violations), *cert. denied*, 459 US 848, 103 SCt 106, 74 LEd2d 95 (1982); State v. Myers, 271 NE2d 245, 250 (Ohio 1971).

[¶17.] What scant precedent exists in South Dakota seems to be more in alignment with jurisdictions like Oregon and Wisconsin. As this Court held two decades ago, evidence will not be excluded for a statutory violation if "the legislative intent behind the rule was not infringed" and the "spirit" of the law was not violated. State v. Miller, 429 NW2d 26, 35 (SD 1988); *see also* State v. Jackson, 371 NW2d 341, 343 (SD 1985); State v. Glick, 201 NW2d 867, 869 (SD 1972). Thus, we first examine the text of SDCL 23-3-35.4, SDCL 23-3-35.5 and ARSD 2:01:13:01 *et seq.* to determine whether these statutes and adjunct administrative rules were designed to protect the public against unauthorized or illegal government conduct. *See Davis,* 666 P2d at 809. If so, then we ask whether the legislative intent or "spirit" behind the law was infringed, such that to effectuate the purpose of the statute the evidence should be suppressed. *See Miller*, 429 NW2d at 35.

[¶18.] As to the public protection question, it is beyond debate that requiring certification for drug detection dogs was a legislative effort to ensure that citizens are not unjustly put through the inconvenience and embarrassment of having their vehicles and property searched by law enforcement officers upon false indication of controlled substances by unqualified canine teams. This overarching public protection purpose is even more evident in the same statute where it requires certification for dogs used in the "detection of the odors of explosive materials, explosive devices, and materials which can be used to construct an explosive device.

. . ." SDCL 23-3-35.4(2). Use of an uncertified canine team in these circumstances generates not only unauthorized or illegal conduct, but also potentially dangerous and life threatening situations. Accordingly, even if the statute does not prescribe suppression or exclusion as a remedy for its violation, if a substantial, intentional, and prejudicial violation occurred, our Legislature would not expect that South Dakota courts would render toothless the protections enabled through the certification requirements. This leads to the next inquiry.

[¶19.] The second part of the analysis, whether the legislative intent or "spirit" behind the law was infringed, presents a more complex question. As noted, certification ensures that canine teams (handlers and dogs) are annually tested as capable of performing their duties. Trooper Oxner and Keya successfully passed their required testing, and although their certification paperwork was delayed, they undoubtedly would have obtained the certificate earlier if the testing results had been timely submitted and reviewed. It might be a different matter had some substantive requirement not been completed, but all that was lacking at the time of the search in question was the certificate. Thus, although we have a clear violation in the use of an *uncertified* canine team, the legislative intent of protecting the public from searches by *unqualified* teams was not subverted. Therefore, the statutory and regulatory violation here does not merit suppression of the evidence.[4]

---

4. We also adopt and incorporate the rationale for declining to suppress from our companion decision in *State. v. Guerra*, 2009 SD 74, ___ NW2d ___.

## 2. Drug Detection Dog Reliability

[¶20.]     To conduct a warrantless search of a vehicle without consent, law enforcement officers must have probable cause. State v. Peterson, 407 NW2d 221, 223 (SD 1987) (citations omitted). An indication by a reliable drug detection dog provides sufficient probable cause. *Nguyen*, 2007 SD 4, ¶22, 726 NW2d at 878; *Lockstedt*, 2005 SD 47, ¶11, 695 NW2d at 721; *Chavez*, 2003 SD 93, ¶30, 668 NW2d at 99. Whether a dog is reliable depends on an examination of the totality of the circumstances. *Nguyen*, 2007 SD 4, ¶20, 726 NW2d at 877. In making a determination of reliability, courts "may consider a variety of elements, including such matters as the dog's training and certification, its successes and failures in the field, and the experience and training of the officer handling the dog." *Id.*

[¶21.]     In challenging Keya's reliability before the circuit court, defendant asserted that the dog failed to perform sufficiently in its testing scenarios and its false indications in the field showed that its proficiency level was "as low as 36%, or possibly only as high as 45%." To support these arguments, defendant called drug dog expert, Robert Gonzalez. In Gonzalez's opinion, Keya was not properly trained or tested, and its record in the field indicated a substandard proficiency level. Rejecting these opinions, the circuit court found that Gonzalez had "never been a canine handler for a civilian police agency," that he "believed that the International Standard of Police Service Dogs, which is recognized by more than 60% of the world did not meet his standards or certification[,]" and that "other nationally recognized dog associations, mainly the North American Police Work Dog Association and the United States Police Dog Association did not meet his standards for certification. . .

." The court found that the only standards that Gonzalez approved of "would fall under the Department of Defense, yet when questioned, he could not provide a written or oral recitation of these standards."

[¶22.]     The State relied on the testimony and opinions of Sgt. Duis, who testified that Keya had passed its certification testing and was reliable. Under the totality of circumstances, these questions often come down to matters of credibility. *Nguyen*, 2007 SD 4, ¶20, 726 NW2d at 877. As one court wrote, "[w]hen the evidence presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the 'credibility' of the dog." United States v. Diaz, 25 F3d 392, 394 (6thCir 1994). Here, in assessing Keya's "credibility," the court found "more compelling the credentials of Sergeant Duis" and rejected the testimony of Mr. Gonzalez "as his experience and qualifications were less relevant than that of Sergeant Duis." From our review of the record we cannot say that the court's findings were clearly erroneous or that its conclusions constituted legal error.

[¶23.]     Affirmed.

[¶24.]     GILBERTSON, Chief Justice, and ZINTER, Justice, concur.

[¶25.]     MEIERHENRY, Justice, and SABERS, Retired Justice, dissent.

#24724

MEIERHENRY, Justice (dissenting).

[¶26.]     For the reasons set forth in my dissenting opinion in *State v. Guerra,* 2009 SD74, __ NW2d __, I would hold that the drug dog team was not properly certified under South Dakota law.  I would reverse and suppress the evidence.

[¶27.]     SABERS, Retired Justice, joins this dissent.